THIRD DIVISION
April 18, 2007

No. 1-04-3660

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01CR22931 |
| | ) | |
| LEWIS JACKSON, | ) | The Honorable |
| | ) | Frank G. Zelezinski, |
| Defendant-Appellant. | ) | Judge Presiding. |

Modified on Denial of Petition for Rehearing

JUSTICE GREIMAN delivered the opinion of the court:

A jury found defendant Lewis Jackson guilty of first degree murder and additionally found that the murder resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty and had been committed during the course of an armed robbery. The trial court sentenced defendant to an extended term of natural life in prison. On appeal, defendant contends (1) that the State failed to prove the charge of first degree murder beyond a reasonable doubt; (2) that the court erred in denying defendant's motion to quash his arrest and suppress statements made thereafter when the police did not have probable cause to arrest defendant; (3) that defendant was deprived of a fair trial by the admission of prejudicial other crimes evidence that his DNA profile was contained in a database and that he used drugs; (4) that defendant was deprived of a fair trial by the State's closing comments; (5) that section 111-3(c-5) of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/111-3(c-5) (West 2004)), pursuant to which defendant was found eligible for an extended-term sentence, is unconstitutional; (6) that the trial court erred in refusing to bifurcate the guilt/innocence portion of the trial from the extended-term

eligibility portion of the trial; (7) that the court erred in failing to define wanton cruelty to the jury and in failing to explain to the jury the factors it should consider in determining whether defendant was eligible for an extended-term sentence; (8) that the State failed to prove that the crime was committed during the course of an armed robbery beyond a reasonable doubt; and (9) that defendant's sentence was excessive.

The following facts were gleaned from the common law record, the transcript of the hearing on defendant's motion to quash arrest and suppress evidence and the trial transcript. The victim, defendant's aunt, Doris Jackson (hereinafter the victim), lived in a building for seniors in Harvey, Illinois. The victim had lived in the building since she had suffered a stroke which left her paralyzed on her right side and impaired her ability to speak. When the victim was killed, defendant, who had been kicked out of his house by his mother, had been living with her for several weeks. The lobby of the victim's building was only accessible with a key and the door to each apartment in the building locked automatically when it was closed. However, a person without a key could gain access to the lobby if someone inside let him or her in. Each tenant was issued two keys to the front door of the building, two apartment door keys, one mailbox key and one storage room key. The victim and her ex-husband, defendant's uncle Lewis Jackson (hereinafter Lewis), each possessed a front door and an apartment key.

On November 1, 1995, Lewis picked up the victim from her apartment, took her to cash her public aid check and to pay her bills, took her to lunch and dropped her off at her apartment. Generally, after paying her bills, the victim was left with about $100 cash, which she would keep in her bra. However, Lewis did not see the victim place the money in her bra that day.

The following morning, November 2, 1995, at about 7 o'clock, the victim's daughter, Cassandra Jackson (hereinafter Cassandra), telephoned the victim but received no answer. Cassandra was not concerned because the victim often went down to her building's recreation room to get coffee in the morning. That morning at about 7:30, the victim's across the hall neighbor Kenneth Jackson (hereinafter Kenneth) saw the victim in the recreation room.

Later that morning, the building's maintenance man, Willie Stewart (hereinafter Willie), was vacuuming in the lobby of the building when defendant entered the building, asked if the mail had arrived and opened the victim's mailbox. Though Willie did not recall seeing defendant use keys, Willie concluded that defendant would have had to use keys in order to gain access to the building and the mailbox.

That afternoon, at about 3 o'clock, Cassandra went to the victim's apartment building. Because Cassandra did not have a key to enter the lobby of the victim's building, she rang the victim's apartment but received no answer and left.

At around 3:30 that afternoon, Kenneth saw defendant in the hallway outside the victim's apartment. Defendant walked away from the apartment to the stairs. Kenneth did not see keys in defendant's hand and did not see blood on defendant's clothes.

At around 3:30 or 4 that afternoon, Willie and his friend John Simms were outside the building when a man Willie identified as defendant, but who Simms could not identify, came out of the building and asked them for a ride to a currency exchange. They said no and the man used a key to reenter the building.

Cassandra returned to the building at about 6 p.m. and, after ringing the victim's doorbell

3

and receiving no response, rang Willie's doorbell. Willie let Cassandra into the building and into the victim's apartment. In the apartment, Cassandra and Willie found the victim dead in a puddle of blood on her bedroom floor. Cassandra noticed that a television was missing from the living room and another was missing from the bedroom. Willie called the police.

Detective Rizzi and Lieutenant Hill arrived at the apartment shortly thereafter. Hill walked through each room of the apartment taking notes, measurements and photographs. From the bedroom, Hill collected two bloodstained pillowcases, two bloodstained bedsheets, a broken knife blade, a small metal rivet that was consistent with the handle of a knife, a bloodstained yellow jacket and a baseball hat. Hill observed that the blood on the floor of the bedroom indicated that the victim had moved after blood had been shed and that the victim had suffered multiple stab wounds to her hands, arms and chest area. In the bathroom, Hill observed several drops of blood on the toilet, floor, sink and bathtub. She collected a swab of blood from the toilet and a swab of blood from the side of the bathtub. She also collected a blood-soaked dollar bill from the bathroom floor. Hill observed that the pattern of dust on a table in the kitchen and on a dresser in the bedroom was consistent with Cassandra's assertion that two televisions had been removed from the apartment. There was no sign of forced entry to the victim's apartment, no keys were found in the apartment and no money, other than the blood-soaked dollar bill, was found in the apartment; however, a purse hanging on a doorknob in the apartment was not searched.

Rizzi and Hill returned to the police station, where Rizzi spoke with Lewis, Cassandra and Kenneth. Then Lewis, Cassandra and Cassandra's husband, Shannon Frazier (hereinafter

Shannon) returned to the victim's apartment. While they were cleaning the apartment, Cassandra and Shannon heard keys jingling and saw the door to the apartment crack open. Shannon went to the door and saw defendant walking away. Shannon called out to defendant and defendant came back to the apartment. Shannon did not notice any cuts on defendant's hands at that time. Lewis told defendant that the police wanted to talk to him and Shannon drove defendant to the police station.

When Shannon and defendant arrived at the station, defendant went to the bathroom. He was then taken into an interview room with Rizzi. Shannon went into the bathroom after defendant and found a set of keys, which he recognized as the victim's, sitting in the wastebasket. Shannon called Cassandra and told her about the keys.

In the interview room, Rizzi advised defendant of his Miranda rights and noticed, as defendant was initialing a form regarding those rights, that defendant had cuts on the palms of both of his hands. After speaking with defendant for 10 minutes, Rizzi was called to the front desk and was advised that Cassandra had called about the keys. Rizzi went to the bathroom and recovered the keys from the wastebasket and set them on his desk. Rizzi then returned to the interview room.

Defendant told Rizzi that he had last seen the victim on November 1 and had returned to her apartment at 10 a.m. on November 2. At that time, defendant could not get into the apartment because it was locked, so defendant went to his friend Clarence Douglas's (hereinafter Clarence) apartment, which was also in the building, and "got high" with Clarence and a woman named Joan. Defendant and Joan then went to the area of 159th Street and Carrs Avenue until 1

5

a.m. November 3, when he returned to the apartment. Defendant acknowledged that he was aware that the victim kept her money in her bra. Defendant could not recall where he had gotten the cuts on his hands and agreed to allow them to be photographed. Rizzi took six pictures of defendant's hands, placed him under arrest and took him to the police station lockup.

Back at the victim's apartment, Shannon and Lewis found several items of clothing in the hamper that appeared to have blood on them. They brought the clothes to the police station.

At 4 p.m. on November 3, 1995, after advising him again of his Miranda rights, Rizzi had a second conversation with defendant. Rizzi confronted defendant about the victim's money and defendant stated that he did not need money because he had just cashed a $99 unemployment check. Defendant denied that the keys recovered from the station bathroom belonged to him. Defendant stated that on November 1 at 11 p.m. he went to Clarence's apartment, where he stayed until 2 a.m. on November 2. Defendant then met a man in a gray Chrysler and got high. Defendant returned to the victim's apartment at 3 a.m. and found the door unlocked. Defendant retrieved his jacket from the apartment but did not see the victim. He then proceeded to get high with the man in the gray Chrysler again and returned to the victim's apartment at 10 a.m. on November 2 to find the door locked. Defendant spent the rest of the day getting high at Clarence's apartment and at 159th and Carrs and returned to the victim's apartment at 1 a.m. on November 3.

On the evening of November 4, 1995, Assistant State's Attorney Frank Cece spoke with defendant after advising him of his Miranda rights. Cece noticed a cut on defendant's right palm during their conversation. Defendant related to Cece that he had returned to the victim's

apartment at 10 a.m. on November 2 after being out all night to find the apartment door locked. Defendant then went to Clarence's apartment, then to the area of 158th and Carr,s where he drank alcohol and got high with several friends. At 1 a.m. on November 3, defendant returned to the apartment.

Cece spoke with defendant a second time on the evening of November 4, 1995, after advising him of his Miranda rights. Defendant stated that he had left the victim's apartment at 11 p.m. on November 1 to go to Popeye's restaurant and then to Clarence's apartment, where he drank alcohol and got high. At 2 a.m. on November 2, defendant returned to the victim's apartment, which was unlocked, and retrieved his jacket but did not see the victim. He then spent the remainder of the night at 159th and Dixie and getting high with a man in a car. When defendant returned to the victim's apartment, he found the door locked, so he went back to Clarence's apartment then to 158th and Carrs and returned to the victim's apartment at 1 a.m. on November 3. When confronted about the victim's public aid check, defendant stated that he did not need money because he had just cashed an unemployment check.

On the afternoon of November 5, 1995, at defendant's request, Cece had a third conversation with defendant after informing him of his Miranda rights. Defendant reported that at 9 or 10 a.m. on November 2, he went to the victim's apartment and discovered that a television was missing and that the victim was on the floor in a puddle of blood. Cece confronted defendant with the facts that the police found blood in the bathroom, a bloody dollar bill and a knife. Defendant stated that he rolled the victim over, panicked and washed the blood off his hands in the bathroom sink. He then left the apartment, leaving the door unlocked, went for a

7

walk, went to Clarence's apartment, then returned to the victim's apartment. He stayed at the victim's apartment for 20 or 30 minutes then returned to Clarence's apartment. Defendant went back to the victim's apartment at 1 a.m. on November 3.

After speaking with Clarence and Kenneth, Cece had a final conversation with defendant. Defendant stated that he had been at Clarence's drinking alcohol and smoking crack cocaine until the early morning of November 2. Sometime after daybreak, defendant returned to the victim's apartment, where he "blacked out" in the living room. He did not know for how long he blacked out. When defendant woke up, he saw that the victim had been murdered and that there was blood everywhere. Defendant touched the victim then washed the blood from his hands with a washcloth and towel in the bathroom. Defendant then changed clothes and left the victim's apartment, leaving the door unlocked. Later he returned to the victim's apartment, took the victim's keys and left the apartment, locking the door behind him. Defendant returned to Clarence's apartment, went with Joan to cash his $99 unemployment check and went to Carrs to "party." Defendant stated that he might have touched the blood stained dollar bill recovered from the bathroom.

Thereafter, the decision was made to continue the forensic investigation of the crime and defendant was released from custody without being charged.

Rizzi and Hill attended the victim's autopsy. Dr. Cogan, a medical examiner, testified that the victim had been stabbed 30 times. She sustained 17 defensive stab wounds to her arms and hands. These wounds, along with hemorrhaging to her forehead and leg, indicated that the victim had struggled. Of the 13 wounds the victim sustained to her torso, two went through her

lungs and heart, breaking her ribs, and were likely to have been immediately fatal. In addition to two broken ribs, the victim sustained a broken bone in her arm and a broken bone in her hand. In Cogan's opinion, the victim had died of multiple stab wounds.

Following the autopsy, Hill took the victim's fingernails, vaginal, anal and oral swabs, blood standard and pieces of the victim's arm and rib bones to her lab. She gave Rizzi the victim's dress, bra and socks, which he inventoried the next day. Rizzi also inventoried the keys that were recovered from the police station bathroom, the photographs of defendant's hands and the clothing found in the victim's apartment. The keys were later identified as the victim's. A month later, Rizzi went on a year-long disability leave.

In December 1995, forensic expert Jeanna Dufresne Walock tested several items recovered from the scene, including the knife, the dollar bill and the swabs from the toilet and bathtub, and found that each tested positive for the presence of human blood. Walock requested a sample from a suspect to compare to her findings but never received a response.

In 2001, DNA expert Lyle Boicken received a request from an assistant State's Attorney to conduct DNA analysis on the evidence collected in investigating the victim's homicide. Boicken compared blood standards taken from the victim with blood taken from the swabs of the toilet and bathtub, the knife blade, the dollar bill and five sections of the bedsheet. The DNA profile of the blood on the knife blade, the dollar bill and the bed sheet were consistent with the victim's DNA profile. However, the DNA profile of the blood found on the toilet and bathtub were not consistent with the victim's DNA profile. Boicken found that the DNA profile of the blood found on the toilet and bathtub matched defendant's DNA profile, which was on file in the

1-04-3660

Springfield database.

Thereafter, defendant was arrested. Defendant's buccal swab showed that his DNA profile was consistent with the DNA profile of the blood found on the toilet and bathtub.

Rizzi was asked to help find the evidence he had inventoried when the case was first investigated in 1995. Rizzi was only able to locate one photograph of the top of defendant's right hand. He could not locate the keys or any of the clothes recovered from the victim or her apartment.

In the trial court, defendant challenged the admissibility of his statements made after his 1995 arrest, arguing that he was arrested without probable cause. The court found that, given the totality of the circumstances, Rizzi had probable cause to arrest defendant and his statements made thereafter were, therefore, admissible.

The case proceeded to a jury trial. The jury found defendant guilty of first degree murder and additionally found that the murder resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty and had been committed during the course of an armed robbery. The court sentenced defendant to natural life in prison. Defendant appeals.

On appeal, defendant first contends that outright reversal of his conviction and sentence is warranted because he was not proven guilty of first degree murder beyond a reasonable doubt. While we agree with defendant that the facts of this case are very close and the evidence of defendant's guilt was not overwhelming, we do not think outright reversal is warranted on this basis.

"When a defendant challenges the sufficiency of the evidence, the relevant

10

question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.] 'Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution.' [Citations.] A finding of guilt will only be disturbed where the evidence is so unreasonable, improbable or unsatisfactory that there is a reasonable doubt as to the defendant's guilt." People v. McColler, 363 Ill. App. 3d 81, 86-87 (2005), quoting People v. Bush, 214 Ill. 2d 318, 326 (2005).

The evidence presented in this case showed that only two building keys, two apartment keys and one mailbox key were issued to each resident of the victim's building. The victim's ex-husband, Lewis, had one set of keys. At the time of the victim's death, her nephew, defendant had been living with her for a couple of weeks. On November 1, 1995, the victim cashed her public aid check, which generally left her with approximately $100 in cash that she usually kept in her bra. The next day, Kenneth, a neighbor, saw the victim at about 7:30 in their building's recreation room. Later that morning, Willie, the building's maintenance man, saw defendant enter the building and open the victim's mailbox. That afternoon, at 3 p.m., the victim's daughter, Cassandra, was unable to reach the victim at her apartment. At about 3:30, defendant was seen walking away from the victim's apartment. Shortly thereafter, he was seen outside the building asking for a ride and reentering the building, using a key. At 6 o'clock that evening, the victim was found stabbed to death on her bedroom floor. There was no sign of forced entry to the victim's apartment. Though the only money found in the victim's apartment was a bloody

dollar bill, the victim's purse was not searched. Evidence from the victim's bedroom and bathroom was collected. Defendant returned to the apartment at 1 a.m. the next day.

At the police station, defendant gave various versions of his whereabouts on November 1 and 2, 1995, but did not admit to killing the victim. Police detective Rizzi and Assistant State's Attorney Cece noticed cuts on defendant's hands and Rizzi took multiple pictures of defendant's hands. After defendant used the police station bathroom, a set of keys, which was identified as the victim's, was found in the wastebasket. Several years later, the DNA of two swabs of blood found in the victim's bathroom on the night of her murder were tested and found to match defendant's DNA profile; however, none of the blood collected from the victim's bedroom matched the defendant's DNA profile. Much of the evidence collected in the investigation of the case, including clothes from the apartment, all but one of the photographs of defendant's hands and the keys recovered from the police station restroom, was lost.

There was not overwhelming evidence of defendant's guilt presented in this case, and in fact we would characterize this as a very close case; however, we cannot say that, viewing the evidence in the light most favorable to the State, a rational trier of fact could not have found defendant guilty of first degree murder beyond a reasonable doubt. Accordingly, outright reversal is not warranted.

Defendant next contends that the court erred in finding that Rizzi had probable cause to arrest defendant in 1995. The court's error, defendant argues, mandates reversal of defendant's conviction and sentence and remand for a hearing to determine whether his statements made after that arrest were sufficiently attenuated from the arrest to be admitted at trial.

An arrest executed without a warrant is valid only if supported by probable cause. People v. Montgomery, 112 Ill. 2d 517, 525 (1986).

> "Probable cause exists when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime. [Citations.] Whether probable cause is present is governed by common-sense considerations [citations] and the calculation concerns '[t]he probability of criminal activity, rather than proof beyond a reasonable doubt.' " Montgomery, 112 Ill. 2d at 525, quoting People v. Tisler, 103 Ill. 2d 226, 236 (1984).

We review a ruling on a motion to suppress involving probable cause *de novo*. People v. Sorenson, 196 Ill. 2d 425, 431 (2001).

In this case, when he arrested defendant, Rizzi had examined the scene of the crime and had observed that there was no sign of forced entry into the victim's apartment. He was aware that several witnesses had seen defendant in the building and coming out of the victim's apartment on the day of the murder. Rizzi knew that defendant likely had access to the victim's apartment because on the day of the murder he had been seen entering the building and opening the victim's mailbox, which could only be done with a set of keys. Rizzi had been told by Cassandra that defendant was a crack user and that defendant and the victim had fought over money.[1] Rizzi was aware that the victim had cashed her public aid check the day before, that she

---

[1]Significantly, this was testified to at the suppression hearing but was not testified to at trial.

generally kept her money in her bra and that no money was found on the victim's person. Under these circumstances, Rizzi had probable cause to arrest defendant on November 3, 1995.

Next, defendant contends that he was deprived of a fair trial by the court's admission of other crimes evidence.

Other crimes evidence is not admissible to show a defendant's propensity or disposition to commit crime because it "overpersuades the jury, which might convict the defendant only because it feels he is a bad person deserving punishment." People v. Thingvold, 145 Ill. 2d 441, 452 (1991). However, other crimes evidence is admissible, where relevant, to prove *modus operandi*, intent, identity, motive or absence of mistake. People v. Illgen, 145 Ill. 2d 353, 364-65 (1991). A trial court's ruling on the admissibility of other crimes evidence will not be reversed absent an abuse of discretion. Thingvold, 145 Ill. 2d at 452-53.

Concerning other crimes evidence, defendant first contends that the court erroneously admitted Boicken's statement that the DNA profile of blood found on the toilet and bathtub of the crime scene matched defendant's DNA profile, which was on file in a DNA database. Specifically, the following exchange took place between Boicken and the assistant State's Attorney:

"[Assistant State's Attorney:] And what did you do with that profile from the tub and toilet?

[Boicken:] The profiles were uploaded into what is called a data base [sic].

[Assistant State's Attorney:] And did you get any results from putting that profile into the data base [sic]?

14

[Boicken:] Yes. I ended up obtaining a match.

[Assistant State's Attorney:] And did that match give you the name of any particular person?

[Boicken:] It gave me a reference number from which I would need to call down to Springfield and give to the codus administrator, the data base [sic] administrator, and they would look up the reference number to who it hit to.

[Assistant State's Attorney:] What was the name of that person?

[Boicken:] Lewis Jackson.

[Assistant State's Attorney:] And again, I don't think I asked this question, but did the stain from the tub and the stain from the toilet bowl, were those the same DNA profile?

[Boicken:] Yes.

[Assistant State's Attorney:] And after you got the results from the computer data base [sic], what did you do? Did you telephone anyone?

[Boicken:] I telephoned the codus data base [sic] administrator in Springfield."

Defendant argues that this exchange implied that defendant had previously been convicted of other crimes and prejudiced the jury against him, depriving him of a fair trial.

Neither party cites a case in which this exact issue was addressed, nor has our independent research revealed one. However, our discussion of this contention is informed by cases in which witnesses have testified that the defendants' fingerprints were on file with the

government.  These cases have consistently held that "[a] law enforcement officer's isolated and ambiguous statement that he obtained defendant's fingerprints from a state agency's database does not by itself indicate that defendant has a criminal background." People v. Jackson, 304 Ill. App. 3d 883, 894 (1999), citing People v. Hopkins, 229 Ill. App. 3d 665, 676 (1992); People v. Prewitt, 160 Ill. App. 3d 942, 949 (1987).  The courts have reasoned that jurors, through their collective knowledge, are aware that the fingerprints of crime victims, government employees, members of the military, police officers and security personnel are kept on file by the government and therefore they would not infer from the information that the defendant had a criminal background.  Jackson, 304 Ill. App. 3d at 894; Hopkins, 229 Ill. App. 3d at 676; Prewitt, 160 Ill. App. 3d at 949.

In Prewitt, a witness made an isolated reference to the fact that he obtained the defendant's fingerprints from a computer database that uses the state's crime lab.  However, he did not make specific reference to the defendant's criminal history.  The court found that the statement did not constitute reversible error.

In Jackson, in addition to making a singular reference to the fact that the defendant's fingerprints were filed in a government fingerprint database, the witness further testified that the database contained fingerprints of every other individual arrested, police officers and government employees.  Neither the witness nor the prosecutor stated that the defendant had prior arrests or convictions.  The court found that the reference to the fingerprint database was not erroneous.

Here, Boicken's reference to the fact that defendant's DNA profile was contained in a DNA database in Springfield, while not singular, was brief.  Moreover, no further reference was

made at trial to defendant's prior arrests or convictions and no explanation was given as to why defendant's profile was in the database. However, we find this case distinguishable from Prewitt and Jackson. In those cases, the holding that references to the fact that the defendants' fingerprints were filed in a government database were harmless was based on the assumption that jurors are generally aware that fingerprints are taken and kept in databases for a variety of reasons unrelated to criminal activity. Such is not the case with DNA databases, which, to this court's knowledge, are utilized for little else than storage of the DNA profiles of convicted criminals.

Furthermore, the evidence that the DNA profile of the blood found on the toilet and bathtub matched defendant's DNA profile, which was filed in the DNA database, was cumulative. Boicken further testified that a buccal swab obtained directly from defendant showed that defendant's profile matched that of the blood found on the toilet and bathtub. See People v. Cortes, 181 Ill. 2d 249, 285 (1998) (holding that the admission of other crimes evidence was erroneous when "the State could have easily accomplished its purpose without referring to the fact that defendant had just been sentenced at the time [the witness] met him and that [the witness] had accepted him as one of her probationers"). Moreover, we note that, had Boicken simply testified that the DNA profile of blood found on the toilet and bathtub of the crime scene matched defendant's DNA profile, without mentioning the fact that defendant's DNA profile was stored in a database administered out of Springfield, we would not find his testimony prejudicial.

Accordingly, we find that it was error to admit Boicken's statement regarding the DNA

17

database. Again, we observe that the facts of this case were very close. Though we cannot say that no reasonable trier of fact could have found defendant guilty of murder beyond a reasonable doubt, the evidence of defendant's guilt was far from overwhelming. As a result, we find this erroneous admission of evidence tending to suggest that defendant had committed other crimes deprived defendant of a fair trial and warrants reversal of defendant's conviction and sentence and remand for a new trial. Again, we observe that the collection and storage of DNA as a means of identifying individuals is a relatively new process and is not widespread. In the future, as DNA is used for identification of individuals in more and more areas, and as the public becomes generally aware of those uses, a different rule might obtain.

In light of this conclusion, we need not address defendant's contentions that the State engaged in several instances of prosecutorial misconduct, that the jury was incompletely instructed or that defendant's sentence was excessive. We also need not address defendant's contention that the sentencing enhancement factor of armed robbery was not proven beyond a reasonable doubt; however, we note that virtually no evidence supporting a finding of guilt of this charge was presented and that, in fact, the State all but conceded at oral argument that defendant was not proven guilty beyond a reasonable doubt of armed robbery.

Finally, though not determinative of our ultimate decision in this case, we feel compelled to comment on defendant's three remaining contentions. First, defendant contends that the court erred in admitting other crimes evidence in the form of statements he made after his 1995 arrest that concerning his drug use on the day before and the day that the victim was killed. Defendant further argues that the court's error was compounded by the State's comments on the drug use

evidence in closing and the court's failure to issue a jury instruction limiting the purposes for which the jury could consider the drug use evidence.

In People v. Maounis, 309 Ill. App. 3d 155 (1999), the appellate court adopted the rule of other jurisdictions that evidence of drug use could be presented as a motive in a prosecution for theft if the prosecution established that the defendant was addicted to drugs and that the defendant did not have the financial resources to obtain drugs and applied that holding to the case before it. The court in People v. Klimawicze, 352 Ill. App. 3d 13 (2004), extended the rule espoused in Maounis to a murder prosecution in which the State theorized that the defendant killed her mother to get money to buy drugs.

Pursuant to these rules, we note that the court may have erred in admitting defendant's admissions about drug use on the days surrounding the victim's murder. First, the court barred the State from submitting any evidence at trial that defendant was addicted to drugs. Consequently, no evidence of defendant's addiction was presented to the jury. Second, though testimony was presented that, at the time of her murder, the victim may have been in possession of about $100, the victim's purse was never searched and there was no evidence presented at trial that defendant was in need of money at that time.[2] On the contrary, defendant repeatedly told Rizzi and Cece that on the day of the murder, he had cashed an unemployment check. Evidence was also elicited that on the day of the murder defendant asked for a ride to the currency exchange to cash a check.

---

[2] Testimony was, however, elicited at the suppression hearing that defendant was a crack cocaine user and that he and the victim sometimes argued over money.

If the admission of evidence concerning defendant's drug use was erroneous, it necessarily follows that the State's comments on that evidence in closing were in error and the court's failure to issue an instruction to the jury limiting its consideration of the drug use evidence to the issue of motive did not alleviate any prejudice that error may have caused.

Defendant further contends that section 111-3(c-5) of the Code violates article I, section 7, of the Illinois Constitution (Ill. Const. 1970, art. I,§ 7).

Section 111-3(c-5) of the Code allows the State to allege facts which increase the range of sentencing in the charging instrument or through written notification to the defendant prior to trial. 725 ILCS 5/111-3(c-5) (West 2004). Article I, section 7, of the Constitution provides that a person may not be charged with a crime without grand jury approval or a probable cause hearing. Ill. Const. 1970, art. I, §7. The argument that section 111-3(c-5) of the Code violates article I, section 7, of the Constitution because it allows the State to add an element of an offense without grand jury approval or a probable cause hearing has been addressed and rejected by this court in People v. McClain, 343 Ill. App. 3d 1122 (2003), and People v. Schrader, 353 Ill. App. 3d 684 (2004). We adhere to those decisions.

Finally, defendant contends that the court erred in refusing to bifurcate the guilt/innocence portion of his trial from the enhanced sentencing portion. As a result of this refusal, defendant argues, certain prejudicial autopsy photographs, including photographs of the victim's internal organs taken after autopsy had begun and pictures of removed arm and rib bones which were dented or broken when the victim was stabbed, were introduced prior to a finding of guilt or innocence, depriving defendant of a fair trial.

1-04-3660

As defendant points out, Supreme Court Rule 451 was amended on February 10, 2006, to provide that, effective July 1, 2006, when the State seeks an enhanced sentence pursuant to one of the factors set out in section 111-3(c-5) of the Code, the court may conduct a unitary trial or, upon motion of a party and a finding that the enhanced sentencing factor is not relevant to the question of guilt or a finding that prejudice outweighs the factor's probative value, conduct a bifurcated trial. 210 Ill. 2d R. 451(g).

Unfortunately for defendant, this rule does not apply to his case, which took place before the rule's effective date. Instead, in defendant's case, the trial court was bound to follow case law which provided that, despite the risk of prejudice to a defendant, neither common law nor the legislature authorized a bifurcated proceeding, separating proof of the extended term factor from proof of guilt, in a case such as defendant's. See People v. Norwood, 362 Ill. App. 3d 1121, 1138-40 (2005).

Moreover, while photographs of a victim may be admitted to prove the nature and extent of the injuries allegedly inflicted by a defendant, they must be relevant to prove facts at issue and may be inadmissible if their prejudicial nature outweighs their probative value. People v. Bowman, 357 Ill. App. 3d 290, 298 (2005). When the photographs depict grisly autopsy details without shedding light on a disputed issue, they are generally inadmissible. People v. Batchelor, 202 Ill. App. 3d 316, 330 (1990). The decision to admit photographs rests within the discretion of the court and will not be disturbed absent a showing of abuse. Bowman, 357 Ill. App. 3d at 298.

Here, because both the issues of guilt and whether the crime was brutal or heinous were

21

addressed in the same proceeding, and the grisly autopsy photographs shed light on whether the crime was brutal or heinous, we cannot say that the trial court abused its discretion in allowing the admission of those photographs. Nonetheless, we observe that defendant is correct that had the trial been bifurcated, several of the photographs submitted to the jury may have caused undue prejudice if they had been admitted during the guilt/innocence phase.

Finally, we observe once again that the facts of this case were very close and the evidence of defendant's guilt was far from overwhelming. Nonetheless, for the reasons stated above, outright reversal is not warranted. However, we find that defendant was deprived of a fair trial by Boicken's comments that defendant's DNA was stored in a database and, for that reason, defendant's conviction and sentence are reversed and this case is remanded to the trial court for a new trial.

Reversed; remanded for new trial.

KARNEZIS and CUNNINGHAM, JJ., concur.