NO. 4-06-0180          Filed 10/31/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Clark County |
| RONALD L. REDMAN, | ) | No. 05CF30 |
|     Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Tracy W. Resch, |
| | ) | Judge Presiding. |

JUSTICE MYERSCOUGH delivered the opinion of the court:

In January 2006, the trial court granted defendant Ronald L. Redman's motion to suppress. The State appeals, arguing the court erred because (1) the evidence soon would have been found by lawful means, unrelated to the alleged misconduct; (2) the officers had reasonable suspicion that defendant, who was on probation, was involved in manufacturing methamphetamine and, therefore, the officers could lawfully search defendant and the residence; (3) the officers proceeded reasonably and with greater restraint than called for by the fourth amendment; (4) the officers had probable cause to arrest defendant and the others at the residence; and (5) the consents to search the residence were voluntarily and validly given.

We reverse and remand. The officers had probable cause to arrest defendant once he exited the residence because (1) a

strong odor associated with methamphetamine manufacturing emanated from the property; (2) the officers observed items associated with methamphetamine manufacturing in an open garbage can from a lawful vantage point; and (3) the officers knew defendant sold, used, and manufactured methamphetamine.

## I. BACKGROUND

In April through December 2005, the State charged defendant with various offenses arising out of events occurring in April 2005: (1) unlawful manufacture of a controlled substance, less than 15 grams of a substance containing methamphetamine (720 ILCS 570/401(d) (West 2004)) (count I); (2) unlawful possession of a controlled substance, less than 15 grams of a substance containing methamphetamine (720 ILCS 570/402(c) (West 2004)) (count II); (3) unlawful manufacture of a controlled substance, 100 grams or more but less than 400 grams of a substance containing methamphetamine (720 ILCS 570/401(a)(6.5)(B) (West 2004)) (count III); (4) unlawful possession of a controlled substance, 100 grams or more but less than 400 grams of a substance containing methamphetamine (720 ILCS 570/402(a)(6.5)(B) (West 2004)) (count IV); and (5) unlawful delivery of a controlled substance, less than 15 grams of a substance containing methamphetamine (720 ILCS 570/401(d) (West 2004)) (count V).

In December 2005, defendant filed a motion to suppress

evidence illegally seized from a residence located at 205 East Harrison, Casey, Illinois. Defendant argued the officer(s) (1) illegally entered the rear yard; (2) improperly searched a trash can within the curtilage of the home and seized items therein without a warrant; (3) illegally searched the shed without authority, which led to illegal seizure of items from the shed; (4) arrested defendant as a result of the illegal search and seizure; and (5) obtained consent to search after the illegal search and seizure of items, thereby rendering the consent the "fruit of the poisonous tree."

At the hearing, defendant called Officers Richard Shutter and Bill Brown, both with the Clark County sheriff's department, to testify. Both officers testified that they had received training regarding methamphetamine laboratories and were familiar with the odor associated with methamphetamine production based on their training and experience.

Officer Shutter testified that on April 3, 2005, at approximately 6:50 a.m., he was on duty patrolling the vicinity of 205 East Harrison. Officer Shutter routinely patrolled that area because he knew an individual with a history of manufacturing methamphetamine lived three or four houses west of the house at 205 East Harrison.

Pictures of the home at 205 East Harrison show a driveway on the east side of the house leading to a detached one-

car garage at the end of the driveway. The back of the garage has a shed that appears added on to the garage. The front of the house has an open front porch.

Officer Shutter testified he was driving his patrol car with the windows up and the heater on when he detected a strong chemical odor that he knew was related to methamphetamine manufacturing. He described the odor as one caused by the reaction of lithium and anhydrous ammonia during the methamphetamine-manufacturing process. Officer Shutter exited his vehicle and determined the odor was coming from 205 East Harrison but could not tell what portion of the residence emitted the odor.

Officer Shutter did not know who lived at the address. He called dispatch to run the license plates on the two vehicles parked in the driveway. One vehicle belonged to Julie Griffin, a person unknown to Officer Shutter. The other vehicle belonged to defendant. Officer Shutter had previous information that defendant was involved in manufacturing, using, and selling methamphetamine.

Officer Shutter tried to call for assistance from the sheriff and the "task force man" but was unable to contact either. Officer Shutter then called Officer Brown, who was scheduled to come on duty at 8 a.m.

When Officer Brown arrived at approximately 7:30 a.m.,

he "immediately reacted to the odor." Officer Brown described the odor as a chemical odor, the odor of ether or fuel mixed with anhydrous ammonia. The officers decided to knock on the front door to further investigate. Officer Shutter planned to advise the occupants of the odor, ask them to come outside, secure the residence, and possibly seek consent to search. Officer Shutter also testified he intended to arrest the people in the house. Likewise, Officer Brown testified he approached the house intending to further investigate and also arrest the occupants of the house.

Officer Shutter asked Officer Brown to cover the rear of the residence in case any of the occupants tried to flee and also to provide cover for Officer Shutter. Officer Brown testified that as he walked down the driveway toward the back of the house, he heard voices in the residence. As he approached the southeast, rear corner of the house, the odor became stronger. Officer Brown observed four trash cans that Officer Brown did not see until he reached the back of the house. The garbage cans were approximately two steps from the driveway, against the back of the house, and just east of the rear porch steps.

Before Officer Shutter made it to the front door, Officer Brown called for him. Officer Shutter joined Officer Brown at the rear of the house. Officer Shutter explained that

the officers did not have to enter the rear yard to reach the garbage cans.  Anyone who drove in the driveway would conceivably approach the back door the way Officer Brown had approached the back door because a path--not paved but an area where the grass was not growing--was present from the driveway to the steps at the back door.  The rear of the house contained no fences.

Three of the garbage cans were covered with lids.  The fourth garbage can had the lid crammed down inside of the can, perpendicular to the ground.  Officer Brown could see in the garbage can without moving anything.  Officer Brown observed "meth trash," which he explained included "masks" and plastic pitchers with a whitish, dry film on the inside.  The officers believed the garbage can was the source of the odor.  The officers did not seize the items contained in the garbage can.

Officer Shutter returned to the front of the house and knocked on the front door.  No one responded to the knocking. Officer Shutter asked dispatch to call the residence.  Officer Shutter could hear the phone ringing but no one answered the phone.  Officer Shutter knocked on the front door for 10 to 15 minutes.  Officer Shutter announced his name and office and specifically asked for defendant to open the door.  Officer Shutter did not attempt to enter the residence because he was not sure that he could enter.  Officer Shutter believed that given defendant's vehicle and reported methamphetamine involvement, a

- 6 -

strong possibility existed that defendant was in the residence and was involved in manufacturing methamphetamine with other individuals in the residence.

After receiving no answer to the knocks on the door, the officers retreated and set up a perimeter. Officer Shutter called the State's Attorney and requested the process be started for a search warrant to search the residence, vehicles, and outbuildings.

Officer Shutter then called Casey officer Bob Mall. Shutter also received information--he could not remember how-- that defendant was on probation in Coles County. Shutter called the Coles County sheriff's department and received the name of defendant's probation officer, Steve Kelly. Officer Shutter asked dispatch to contact defendant's probation officer. Officer Shutter believed that defendant, as a probationer, was subject to warrantless searches, and Officer Shutter believed he would be able to enter the residence with the probation officer, so long as he had reasonable suspicion. Officer Shutter thought he had reasonable suspicion to enter the residence with defendant's probation officer due to the odor.

While waiting for Kelly to arrive, Officer Shutter walked to the shed attached to the back of the garage and looked into a window opening that had no glass. Officer Shutter could see a tank he believed might be used for anhydrous ammonia and

rubber hoses. Officer Shutter took photographs of the residence from all angles, the garbage can with the methamphetamine trash, and the shed.

When Kelly arrived, he informed Officer Shutter that the address was not defendant's probation address. Kelly told Officer Shutter he could not do a probation check on defendant at that address.

Officer Shutter drove his car into an unpaved alley behind the house. The garbage cans and shed were visible from the alley. The other officers took positions at various points around the residence. Everyone waited.

At approximately 10:30 a.m., Chief of Police Wally Whitton came to the scene. Chief Whitton informed Officer Shutter he had a "somewhat cooperative relationship" with defendant and asked if he could try to get defendant out of the residence. After several attempts, defendant returned Chief Whitton's telephone call. At approximately 11:25 a.m., Chief Whitton was able to convince defendant and the others to come out of the residence. The other occupants in the house included Griffin, Matt and Nicki Hensley, and two small preschool-age children (Griffin's daughter and Nicki's daughter).

Once the four individuals exited the residence, Officer Shutter placed them under arrest for manufacturing methamphetamine. Officer Shutter testified he would have

arrested them based on the odor even if he had not known about the items in the garbage can. Officer Shutter handcuffed the four individuals and placed them on the sidewalk. The State's Attorney then called and told Officer Shutter to be ready to go before a judge in 30 minutes. Officer Shutter informed the State's Attorney that the four individuals had just exited the residence. The State's Attorney suggested that Officer Shutter try to obtain written consent to search.

Officer Shutter obtained a written statement from all four people to search the residence, vehicles, and the outbuildings. Officer Shutter denied using any force to obtain their consents. Officer Shutter testified he told them they did not have to consent. Officer Shutter also told the individuals that he had been in contact with the State's Attorney, and the State's Attorney informed him that a judge had been contacted and would be ready in about a half hour. Officer Shutter told the individuals that if they gave consent to search, he would mention their cooperation in his report. If they did not give consent to search, they would have to wait while Officer Shutter met with the State's Attorney to see if the judge would approve the warrant, in which case he would mention in his report they were uncooperative.

During the search, the officers found a rent receipt dated October 2004 signed by Dean Roberts for rent from Griffin

and defendant.  Officer Shutter also found mail with defendant's name and the 205 East Harrison address, as well as clothing that belonged to a male approximately defendant's size.  Officer Shutter believed defendant told him defendant lived there.  Griffin later told Officer Shutter that defendant had been living with her for several months.

The officers searched every room of the house.  Officer Shutter saw a chemical stain on the basement floor.  Also in the basement, Officer Shutter observed pots and pans that appeared to have been freshly washed and matched the size of the stains on the basement floor.  Officer Shutter seized from the basement two metal pots, two containers of drain cleaner, salt, a glass Ball jar, dust mask, duct tape, and three pairs of wire cutters.  Officer Shutter seized from the kitchen coffee filters and aluminum foil.  In the wastebasket, Officer Shutter found used coffee filters, which he described as typically being used in the filtering process of manufacturing methamphetamine.  The filtering phase involves "separating the pseudoephedrine, the ephedrine from the tablet."  Officer Shutter explained that the pills are red, resulting in a pinkish residue.  The coffee filters contained white and pinkish powder.

Officer Shutter also found in the wastebasket paper towels containing red pill residue, used foil inside a crushed pop can, a broken glass Ball jar, and orange-scented Pine-Sol

that had been poured in the pop can. Officer Shutter also seized the items from the garbage can outside, which included plastic pitchers. From the shed, Officer Shutter seized a stainless steel tank that had not been altered and had no odor of anhydrous ammonia and two pieces of rubber hose--known to be used for stealing ammonia--that also contained no odor of ammonia. A metal valve handle was seized from inside Matt Hensley's pants. Officer Shutter did not find any methamphetamine and believed the individuals got rid of it during the 4 1/2 hours it took to get them out of the house.

After getting information from the four individuals after their arrest, the officers obtained a search warrant the next day and returned to search the property. As a result of the second search, the officers seized burnt foil, a crushed aluminum can containing two Ziploc bags with unknown residue, and a gray ink "tooter" containing what was suspected to be methamphetamine. (Officer Shutter did not define the term "tooter.") In the basement, the officers found empty gallon containers of Ozark Trails campfire fuel and, from behind a false wall, a gallon container of Liquid Fire drain cleaner.

The owner of the uninhabited property next door, "Mr. Funk," gave the officers permission to search a shed on his property. The officers seized an altered oxygen tank. The valve had turquoise-colored corrosion typical of a container used for

anhydrous ammonia.  The officers also seized a fire extinguisher, located next to the oxygen valve, with a nylon-like gym bag or carry satchel.

On January 27, 2006, the trial court issued its ruling granting the motion to suppress.  The court concluded that no exception to the warrant requirement was shown to authorize a warrantless search of the dwelling and the curtilage. Specifically, the court found that (1) because the search of the house and the curtilage was unlawful, the court need not address constitutional issues raised by the "walk around"; (2) the special-needs (probation) exception did not apply because the State offered no evidence of a court order that would serve as grounds for a probationary search; (3) the administrative-search exception did not apply because in the 4 1/2 hours that elapsed between the detection of the odor and the search, the officers took no action suggesting they believed the public was in imminent danger from an operating laboratory; (4) the plain-view exception did not apply because, even if the visual inspection of the garbage can constituted a plain-view search, that did not excuse the warrant requirement; (5) the search-incident-to-arrest exception did not apply because the officers had no probable cause to arrest and, even if the persons in the house were subject to arrest, the exception does not support a warrantless search of the dwelling and the curtilage; and (6) the consent

exception did not apply because the arrests of defendant and the others lacked probable cause and were therefore illegal. The court also noted that the odor from the garbage can would have justified issuance of a search warrant to seize the garbage. The court opined that the officers should have watched the garbage can while applying for the search warrant to observe any person who approached the can and demonstrated a possessory interest linking them to the evidence in the garbage can.

The State filed its certificate of impairment, and this appeal followed.

## II. ANALYSIS

On appeal, the State argues the trial court erred by suppressing the evidence because (1) the evidence would have soon been found by lawful means because (a) the officers had reasonable suspicion that defendant, who was on probation, was involved in manufacturing methamphetamine and, therefore, the officers could have lawfully searched defendant and his residence; and (b) a request for a search warrant was in progress and would have been granted based on experienced officers having detected an odor associated with methamphetamine manufacturing; (2) the officers proceeded reasonably and with greater restraint than called for by the fourth amendment; (3) the odor gave the officers probable cause to arrest defendant and the others at the residence; and (4) defendant's and Griffin's consents to search

the residence were voluntarily and validly given.

Defendant argues as follows: (1) odor alone did not provide probable cause for the officers to enter onto the property and search the house and the curtilage without a warrant; (2) no exigent circumstances justified the warrantless search; (3) the consent to search was involuntary because the officers lacked probable cause to arrest any of the adults in the house; (4) the probationer-warrantless-search exception does not apply because defendant's probation order and conditions were not entered into evidence; and (5) the inevitable-discovery doctrine does not apply because (a) it cannot be assumed a judge would have issued a search warrant and (b) a search warrant would not have been based on an independent line of investigation.

We agree with the State. The officers observed the items contained in the garbage from a lawful vantage point. That evidence, along with the evidence that defendant's vehicle was parked in the driveway, defendant was known to manufacture, sell and use methamphetamine, and the odor coming from the garbage can was associated with methamphetamine manufacture, gave the officers probable cause to arrest defendant. The officers arrested defendant in a public place and did not illegally enter the residence. A search of the residence did not occur until consent had been obtained.

A. Standard of Review

- 14 -

The review of a trial court's ruling on a motion to suppress involves mixed questions of fact and law. People v. Gherna, 203 Ill. 2d 165, 175, 784 N.E.2d 799, 805 (2003). This court gives great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. Gherna, 203 Ill. 2d at 175, 784 N.E.2d at 805. However, this court reviews de novo the trial court's legal determination of whether suppression is warranted under those facts. Gherna, 203 Ill. 2d at 175, 784 N.E.2d at 805.

In this case, the State does not challenge the trial court's factual findings but argues suppression was not warranted under those facts. Therefore, our review is de novo.

B. The Officers Did Not Violate the Fourth Amendment's Prohibition Against Unreasonable Searches and Seizures

The fourth amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV. Likewise, under our state constitution, "[t]he people shall have the right to be secure in their persons, houses, papers[,] and other possessions against unreasonable searches[] [and] seizures." Ill. Const. 1970, art. I, §6. As recently stated by this court in People v. Leggions, 382 Ill. App. 3d 1129, 1132, 890 N.E.2d 700, 704 (2008):

"We interpret article I, section 6, in 'lim-

- 15 -

ited lockstep' with the fourth amendment. People v. Caballes, 221 Ill. 2d 282, 313, 851 N.E.2d 26, 44 (2006) (reaffirming the 'limited lockstep' doctrine). 'Under this approach, [Illinois courts] will "look first to the federal constitution, and only if federal law provides no relief [will they] turn to the state constitution to determine whether a specific criterion--for example, unique state history or state experience--justifies departure from federal precedent."' Caballes, 221 Ill. 2d at 309, 851 N.E.2d at 42-43, quoting L. Friedman, The Constitutional Value of Dialogue and the New Judicial Federalism, 28 Hastings Const. L.Q. 93, 104 (2000)."

In this case, neither of the parties argues for a departure from federal precedent on the ground that article I, §6, of the Illinois Constitution requires a different outcome than the fourth amendment. Therefore, this court will interpret the quoted provisions from the two constitutions as having the same meaning and effect.

### 1. The Initial Entry Onto the Property Was for a Legitimate Purpose and Officers Lawfully Observed the Contents of the Garbage Can

In the case sub judice, the trial court found it

unnecessary to determine whether the police officers' original "walk-around *** was compliant with the [f]ourth [a]mendment." The court noted that the garbage can was not searched during the initial "walk-around" but only later after the full search of the residence. The court concluded that, given its conclusion that the search of the house and curtilage was unlawful, it was unnecessary to address the constitutional issues raised by the walk-around. We disagree and conclude this court must determine whether the officers lawfully approached the house and lawfully observed the contents of the garbage can.

An officer may lawfully approach the front door of a residence to conduct an investigation--referred to by many courts as a "knock and talk"--so long as the officer enters an area impliedly open to the public. See United States v. LePage, 477 F.3d 485, 488 (7th Cir. 2007) (finding the officers did not act unreasonably when they walked onto the porch of the home and observed a partially open duffel bag containing a shotgun); United States v. Walters, 529 F. Supp. 2d 628, 637 (E.D. Tex. 2007) (finding that the fourth amendment is not implicated when an officer visits a house in the same lawful way that an ordinary citizen would). An officer may go beyond the front door to investigate by approaching the back door of a residence--either when no one answers a knock on the front door or where a legiti-mate reason is shown for approaching the back door. See People

v. Hunley, 313 Ill. App. 3d 16, 24, 728 N.E.2d 1183, 1193 (2000) (finding no violation of the fourth amendment where the police officers peaceably entered common backyard and open back porch to investigate complaints received about occupants of the apartment); see also, e.g., VanWinkle v. State, 764 N.E.2d 258, 264 (Ind. App. 2002) (finding the defendant had no reasonable expectation of privacy in the front and rear doors of the mobile home); Hardesty v. Hamburg Township, 461 F.3d 646, 654 (6th Cir. 2006) (finding that the decision to proceed around the house and seek a back door after receiving no response to a knock at the front door was within the scope of the "knock and talk"). In this case, Officer Brown proceeded to the back of the house in case the occupants attempted to leave from the rear and Officer Shutter needed protection. Therefore, Officer Brown had a legitimate reason for approaching the back door.

According to their testimony, Officer Shutter and Officer Brown approached the house to knock on the front door either as part of an investigation or to arrest the occupants of the house. Either reason was a legitimate purpose for being on the property (so long as the officers had probable cause to arrest the occupants of the house, an issue discussed further below). See People v. Dennison, 61 Ill. App. 3d 473, 478, 378 N.E.2d 220, 224 (1978) (finding the officers were on the property for a legitimate purpose when their presence was for the purpose

- 18 -

of either investigating the defendant about an abandoned car seen on the property the day before or to place the defendant under arrest where the officers had probable cause to do so based on what they observed from the sidewalk before approaching the front door); but see United States v. Khut, 490 F. Supp. 2d 35, 40 (D. Mass. 2007) (holding that "investigating officers may not create exigent circumstances by choosing not to get a warrant, making their presence known by knocking-and-announcing, and then claiming that a warrantless search is necessary to avoid destruction of evidence").

Once an officer is legitimately on the property, he or she may properly observe any "evidence lying about in the open." Dennison, 61 Ill. App. 3d at 477, 378 N.E.2d at 224. A search does not occur when officers observe what is in open view. People v. Berg, 67 Ill. 2d 65, 68, 364 N.E.2d 880, 881-82 (1977); see also, e.g., City of Decatur v. Kushmer, 43 Ill. 2d 334, 338, 253 N.E.2d 425, 428 (1969) (finding no search occurred where the officials entered the land to photograph that which could be observed from the public view). The ability to observe items in plain view extends to odors. See People v. Wright, 41 Ill. 2d 170, 174, 242 N.E.2d 180, 183 (1968) (holding that the "plain[-]view doctrine has been applied to anything which an officer becomes aware of by use of his five senses while in a lawful position").

Therefore, when Officer Brown approached the back door and smelled the strong odor, consistent with methamphetamine manufacturing, emanating from the open garbage can, he lawfully peered inside the open garbage can. Such action constituted neither a search nor a seizure. Specifically, defendant did not have a reasonable expectation of privacy in the contents of the garbage can because the lid was pushed down, perpendicular to the ground, into the garbage can, exposing the contents to anyone who passed by the garbage can on his or her way to the back door.

To summarize, the officers' decision to approach the house and manner in which they did so were reasonable. Officer Shutter noticed the odor associated with methamphetamine production while driving in his vehicle with his windows rolled up, thus indicating the odor was very strong. Defendant's vehicle was in the driveway of the home, and Officer Shutter knew defendant was involved with using, selling, and manufacturing methamphetamine. Approaching the home from the front and the back for safety purposes was also reasonable and proper. Officer Brown walked along a path open to visitors when approaching the back door. While walking along that path, he lawfully smelled and visually observed the open garbage can emanating an odor associated with methamphetamine manufacturing and containing what appeared to be "meth trash."

2. The Officers Had Probable Cause To Arrest Defendant

Having determined the officers legally approached the residence and observed the contents of the open garbage can, the next determination is whether the officers had probable cause to arrest defendant without a warrant.

A warrantless arrest may be conducted by police if they have probable cause to believe that the person to be arrested has committed or is committing an offense. 725 ILCS 5/107-2(1)(c) (West 2004); People v. McGee, 373 Ill. App. 3d 824, 830-31, 869 N.E.2d 883, 889 (2007). The Illinois Supreme Court has stated:

"Probable cause exists when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime. [Citations.] Whether probable cause is present is governed by common-sense considerations [citations], and the calculation concerns '[t]he probability of criminal activity, rather than proof beyond a reasonable doubt.'" People v. Montgomery, 112 Ill. 2d 517, 525, 494 N.E.2d 475, 477-78 (1986), quoting People v. Tisler, 103 Ill. 2d 226, 236, 469 N.E.2d 147, 152 (1984).

This court reviews a ruling on a motion to suppress

involving probable cause de novo.  People v. Jackson, 372 Ill. App. 3d 112, 121, 865 N.E.2d 195, 203 (2007).  Upon review, this court "must examine 'the events leading up to the arrest, and then decide "whether [those] historical facts, viewed from the standpoint of an objectively reasonable [police] officer, [support a finding of]" probable cause.'"  McGee, 373 Ill. App. 3d at 831, 869 N.E.2d at 890 (2007), quoting Maryland v. Pringle, 540 U.S. 366, 371, 157 L. Ed. 2d 769, 775, 124 S. Ct. 795, 800 (2003), quoting Ornelas v. United States, 517 U.S. 690, 696, 134 L. Ed. 2d 911, 919, 116 S. Ct. 1657, 1661-62 (1996).

In this case, the officers had probable cause to arrest defendant.  First, the officers had probable cause to believe that the crime of manufacturing methamphetamine was or had recently been committed.  Officer Shutter and Officer Brown smelled a strong odor consistent with methamphetamine manufacturing coming from the garbage can located up against the back of the house.  See People v. Stout, 106 Ill. 2d 77, 87, 477 N.E.2d 498, 502 (1985) ("A police officer's detection of controlled substances by their smell has been held to be a permissible method of establishing probable cause").  The odor was so strong that Officer Shutter first noticed it while driving in the neighborhood with the windows of his patrol car shut.  Both Officer Shutter and Officer Brown were familiar with methamphetamine manufacturing and the odor produced by such manufacturing.

- 22 -

Both officers testified that the smell coming from the trash can was consistent with the manufacture of methamphetamine. The odor, along with the observation of the "meth trash" in the garbage can up against the back of the house gave the officers probable cause to believe the crime of manufacturing methamphetamine was occurring or had recently occurred at the residence.

The officers also had probable cause to believe that defendant was the one who committed the crime. A vehicle registered to defendant was parked in the driveway, which suggested that defendant was in the home. Officer Shutter was familiar with defendant and knew him to be involved in using, selling, and manufacturing methamphetamine.

The trial court found that the officers lacked probable cause to arrest defendant because no evidence connected defendant to the items seen in the garbage can. In the typical garbage case, officers seize and search garbage placed out at the curb for pickup. See California v. Greenwood, 486 U.S. 35, 37, 100 L. Ed. 2d 30, 34, 108 S. Ct. 1625, 1627 (1988) (holding that the fourth amendment does not prohibit warrantless search and seizure of garbage left for collection outside the curtilage of the home). Officers typically may not obtain a search warrant of the residence absent some evidence tying the garbage to the residence, such as observing an occupant of the residence place the garbage at the curb for pickup or finding in the trash items

tying the trash to the residence, such as mail addressed to the residence.  See People v. Stage, 337 Ill. App. 3d 242, 244, 785 N.E.2d 550, 551 (2003) (probable cause to issue a search warrant of a residence exists where something connects the garbage to the residence); People v. Balsley, 329 Ill. App. 3d 184, 187, 769 N.E.2d 153, 156 (2002) (if garbage is left curbside, officers need evidence tying the garbage to the house to obtain a search warrant for the house).  Once a person terminates his or her privacy interest in the trash by placing it out at the curb, anyone can access it and deposit incriminating items.  See People v. Burmeister, 313 Ill. App. 3d 152, 155, 728 N.E.2d 1260, 1264 (2000) (holding that the officer could use evidence obtained in a garbage can to obtain a search warrant only if the warrant application established probable cause that the curbside evidence came from the residence to be searched); see also United States v. Hedrick, 922 F.2d 396, 400 (7th Cir. 1991) (finding expectation of privacy unreasonable because of the "common practice of scavengers, snoops, and other members of the public in sorting through garbage").

In this case, the garbage can was up against the back of the house, not visible from the sidewalk at the front of the house.  See United States v. 987 Fisher Road, 719 F. Supp. 1396, 1404 (E.D. Mich. 1989) (finding that occupants of the home maintained a reasonable expectation of privacy in garbage con-

- 24 -

tained in closed garbage bags located against the back wall of the house, hidden from the view of ordinary citizens passing by the front of the house).  Although the garbage can was visible from the unpaved alley at the rear of the home, the pictures admitted into evidence show that the contents of the garbage could not be seen from that vantage point.  See 987 Fisher Road, 719 F. Supp. at 1404 (noting that even if the container could be seen by someone walking up the driveway and around the back of the house, that person would only be able to see the closed garbage cans, the contents of which would remain unknown; therefore, the occupants of the house maintained an expectation of privacy that society would recognize as reasonable).  In this case, defendant maintained a reasonable, albeit diminished, expectation of privacy in the garbage can next to the house.  The diminished expectation stems from leaving the garbage can open along a pathway open to visitors entering through the back door. Clearly, the location of the garbage can--up against the house near the back door--and the odor coming from the garbage can at 6:50 a.m., so strong that Officer Shutter noticed it while driving by with his windows shut, presents a strong indication that the contents of the garbage can recently came from the house.

The officers had probable cause to arrest defendant for the unlawful manufacture of methamphetamine based on the follow-

ing: (1) defendant's vehicle was parked in the driveway of the home; (2) Officer Shutter had knowledge about defendant's methamphetamine use, manufacture of the drug, and selling of the drug; (3) the strong methamphetamine-production odor in the street came from the garbage can located next to the residence; and (4) "meth trash" was observed in the garbage can.

### 3. Warrantless Arrest in a Public Place Was Valid

Having found probable cause to arrest, this court must determine whether the officers properly conducted a warrantless arrest. The United States Constitution normally requires the police to obtain an arrest warrant before entering a person's home to make an arrest. Payton v. New York, 445 U.S. 573, 576, 63 L. Ed. 2d 639, 644, 100 S. Ct. 1371, 1374-75 (1980); People v. Lagle, 200 Ill. App. 3d 948, 952, 558 N.E.2d 514, 517 (1990) (holding that "police officers cannot make a warrantless, non-consensual entry into a private residence to effect a routine felony arrest in the absence of exigent circumstances"). However, an officer may "upon probable cause, effect a warrantless arrest in a public place for any felony, or for a misdemeanor committed in the officer's presence." Lagle, 200 Ill. App. 3d at 952, 558 N.E.2d at 517.

In this case, the officers did not enter defendant's home to arrest him. Instead, they waited until Chief Whitton convinced defendant to exit the residence. The arrest occurred

- 26 -

after defendant left the residence. While the record is unclear exactly where the arrest occurred, Officer Shutter clearly testified he arrested defendant after defendant exited the residence. Because a warrantless arrest in a public place with probable cause is permissible, the arrest of defendant once he exited the home was proper. See United States v. Santana, 427 U.S. 38, 42, 49 L. Ed. 2d 300, 305, 96 S. Ct. 2406, 2409 (1976) (a person visible to the public outside a home does not have a reasonable expectation of privacy; therefore, officers could properly attempt to effectuate a warrantless arrest of an individual standing at the threshold of her home); People v. Wear, 371 Ill. App. 3d 517, 532, 867 N.E.2d 1027, 1040 (2007) (holding that the threshold of the front door of a residence is a public place for purposes of a warrantless arrest with probable cause), aff'd, 229 Ill. 2d 545, 893 N.E.2d 631 (2008); People v. Williams, 275 Ill. App. 3d 249, 254, 655 N.E.2d 1071, 1075 (1995) (finding that the porch of a residence was a public place for purposes of a warrantless arrest).

4. Consent To Search Was Not the Product of an Illegal Arrest

After the officers arrested defendant and the other occupants of the house, they obtained written consent to search the house, outbuildings, and vehicles. The State argues the trial court erred by finding the consents invalidated by the allegedly illegal arrest because (1) the arrest was valid and (2)

even if defendant were illegally arrested, the consents were voluntary.

A search conducted pursuant to consent is one of the established exceptions to the requirement of both probable cause and a warrant. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 36 L. Ed. 2d 854, 858, 93 S. Ct. 2041, 2043 (1973). A warrantless search conducted pursuant to valid consent is permissible so long as the consent was given voluntarily. Illinois v. Rodriguez, 497 U.S. 177, 181, 111 L. Ed. 2d 148, 156, 110 S. Ct. 2793, 2797 (1990), citing Schneckloth, 412 U.S. at 219, 36 L. Ed. 2d at 858, 93 S. Ct. at 2043-44. The State bears the burden of proving the "consent to search was freely and voluntarily given." People v. Zynda, 53 Ill. App. 3d 794, 801, 368 N.E.2d 1079, 1085 (1977).

Generally, this court will not disturb a trial court's determination of voluntariness unless it is clearly unreasonable. People v. Alvarado, 268 Ill. App. 3d 459, 463, 644 N.E.2d 783, 786 (1994). In this case, however, the trial court held that because the arrests were made without probable cause, the consents were the "fruit of the poisonous tree." Therefore, the court found it unnecessary to determine whether the consents were voluntarily and knowingly given.

"A defendant's consent is 'involuntary' if '"his will has been overborne and his capacity for self-determination critically impaired."'" Alvarado, 268 Ill. App. 3d at 467, 644

- 28 -

N.E.2d at 789, quoting Schneckloth, 412 U.S. at 225, 36 L. Ed. 2d at 862, 93 S. Ct. at 2047, quoting Culombe v. Connecticut, 367 U.S. 568, 602, 6 L. Ed. 2d 1037, 1057-58, 81 S. Ct. 1860, 1879 (1961). Custody alone is not sufficient to render a consent involuntary. Alvarado, 268 Ill. App. 3d at 467, 644 N.E.2d at 789. In addition to custody, relevant factors for determining whether a consent was involuntary include whether (1) the arrest occurred late at night; (2) the officers made the arrest while displaying weapons; (3) the arrest was made by forcible entry or the use of force; (4) the defendant was handcuffed or kept in close restraint; (5) the officers gained a key or similar means of entry during a search incident to arrest for the place they were asking to search; (6) the officers used the custody to make repeated requests for consent; (7) the custody was used for leverage, such as the officer telling the defendant that he would be released if he consented; (8) the defendant knew or was told he had the right to refuse consent; and (9) consent was obtained after the officer refused to grant the defendant's request to consult with counsel. Alvarado, 268 Ill. App. 3d at 467, 644 N.E.2d at 789, quoting 3 W. LaFave, Search & Seizure §8.2(b), at 183, §8.2(k), at 218 (2d ed. 1987), at 61 (Supp. 1994), and citing People v. Phillips, 264 Ill. App. 3d 213, 217-18, 636 N.E.2d 1118, 1121 (1994).

In this case, the only relevant factors present are

that defendant was in custody and handcuffed.  None of the other factors that might render the consent involuntary were proved.  See, e.g., Alvarado, 268 Ill. App. 3d at 468, 644 N.E.2d at 789 (finding that consent was not involuntary where the only factors present were that the defendant was in custody and handcuffed).  Therefore, defendant's consent was voluntary and justified the search of the residence.

The police officers in this case acted reasonably and showed great restraint.  Instead of immediately and forcibly entering the house on the basis of exigent circumstances, the officers began the process of obtaining a warrant and waited patiently for 4 1/2 hours.  The trial court erred by granting defendant's motion to dismiss.

### III. CONCLUSION

For the reasons stated, we reverse the trial court's order granting defendant's motion to suppress and remand for further proceedings.

Reversed and remanded.

APPLETON, P.J., and McCULLOUGH, J., concur.