NOTICE
Decision filed 08/20/14, corrected 8/21/14. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2014 IL App (5th) 130335

NO. 5-13-0335

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 12-CF-770 |
| | ) | |
| DAVID KOFRON, | ) | Honorable |
| | ) | Robert B. Haida, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE SPOMER delivered the judgment of the court, with opinion.

Presiding Justice Welch and Justice Schwarm concurred in the judgment and opinion.

**OPINION**

¶ 1     The State appeals the orders of the circuit court of St. Clair County that granted the motion to suppress evidence, and the motion to suppress statement, of defendant David Kofron. For the following reasons, we affirm.

¶ 2                                FACTS

¶ 3     The facts necessary to our disposition of this appeal are as follows. On March 19, 2013, the defendant, who faced criminal charges for allegedly possessing methamphetamine and methamphetamine-manufacturing materials, and for allegedly participating in the manufacturing of methamphetamine, filed a motion to suppress

1

evidence. The motion was amended on May 3, 2013, and a hearing on the amended motion began on May 29, 2013, before the Honorable Robert B. Haida. On that date, the defendant's mother testified that between April 10, 2012, and May 22, 2012−the date on which the defendant was arrested in the present case−the defendant lived at the residence of Tiffany Polzin, which was located "catty-cornered just straight across the street" from the residence of the defendant's mother, in Cahokia. Tiffany Polzin testified that between April 10, 2012, and May 22, 2012, the defendant spent "an awful lot of time" at her home, including "many nights." The defendant kept clothes and other personal items at her home and sometimes ate meals at her home, although he did not help pay her bills at the home.

¶ 4    Polzin also testified that when police came to her residence on May 22, 2012, she had a "No Trespassing" sign displayed in a window of the home. When officers attempted to speak to her, she declined their invitation to come outside and speak to them, telling them instead that she would do so only if she had her attorney "to talk to." When police requested consent to search her property, she again declined, telling them "not unless you have a search warrant," and reiterating that she would not come outside until she talked to her attorney. Polzin testified that police persuaded her to come closer to her door, which was partially covered by a screen window. She testified that when she did so, an officer "pushed his hand right through [her] screen and grabbed [her] by the arm and drug [*sic*] [her] out." She testified that several other officers "jumped on top" of her, took her into custody, and then told her they were calling "child services" to take custody of her 13-year-old son and "the pound or whatever" to secure her barking dogs.

Polzin testified that she was eventually told that she was under arrest, but she could not recall if she was ever told the reason for her arrest. She was transported from her residence to a police station, where she was placed in a holding cell. When she asked to speak to an attorney, she was told that she could be held for up to two years "because of some Patriot Act or something," and that the police did not have to let her speak to an attorney or anyone else "until like 72 hours or something." Polzin testified that police told her that the only way she could go home was to give a videotaped statement, which she did. She testified that she gave the statement because authorities had taken her child and her dogs and she "felt overwhelmed with the possibility of losing everything that mattered" to her. Counsel for the defendant moved to have the first five minutes of the videotaped interview admitted into evidence. The State did not object, and the first five minutes of the videotape were admitted into evidence. Subsequently, counsel for the defendant moved to have the last three minutes of the videotaped interview admitted into evidence. The State did not object, and the last three minutes of the videotape were admitted into evidence. The State expressed concern that the entire videotape was not being admitted; however, the judge declined to rule on the admission of the remainder of the videotaped interview, stating, "We can take up the other issue later." We note that the record on appeal presented by the State contains no ruling, at anytime thereafter, from Judge Haida with regard to the admission of the remainder of the videotaped interview.

¶ 5    On cross-examination, Polzin conceded that while she was in custody, she was allowed to speak on the telephone with her "boyfriend" Scott, who was often out of town but with whom she co-owned the home. When asked if after speaking with Scott, Polzin

3

gave officers consent to search her home, Polzin testified: "No. They said that he gave them permission." Polzin conceded that she eventually signed a consent to search form, but testified that she did not read it before signing it, and only signed it because she was told she had to sign it before she could go home. She testified that "[t]hey told [her] that Scott gave them permission to search the home, and that if [she] signed these papers, then [she] could go home" before authorities took her child into custody. On redirect examination, Polzin testified that the defendant was "welcome in every aspect" of her home.[1]

¶ 6    The defendant was the next witness to testify at the hearing. On direct examination, he testified that between April 10, 2012, and May 22, 2012, he stayed at Polzin's home on a regular basis. He testified that at approximately 4 p.m. on May 22, 2012, when Polzin's dogs began barking, he went to the front door of Polzin's home "to see what was going on." He observed a total of three police officers at or near the front door. When the officer standing closest to the door asked the defendant his name, the defendant, who was still inside the home, declined to provide it. Because the dogs were

---

[1]In its opening brief, the State avers, without citation to the record on appeal and without asking this court to take judicial notice of matters outside the record on appeal, that Polzin "was not charged with any offenses" as a result of the events of May 22, 2012. Our review of the record on appeal reveals that it is silent with regard to whether Polzin was ever charged. However, it is clear that Polzin is not a party to this appeal, and we agree with the State that the issues the State raises in this appeal focus on whether the rights of the defendant, not Polzin, were violated.

still barking near the door, and because the defendant "was not going to take a chance trying to squeeze through the door," the defendant told the officer that the defendant had to go out the back door. When asked by counsel if the defendant told the officer to meet him at the back door, the defendant testified: "No. I told him I had to go out the back door." The defendant testified that when the officer at the front door did not respond to his statement, the defendant said, "Is that okay or what?" and the officer replied that it was. When the defendant reached the back door and exited through it into the yard, he observed "an officer standing there with a badge around his neck" who asked the defendant if he lived at the house. The defendant testified that he told the officer multiple times that he did not live at the house, eventually using rather foul language to do so. He testified that there were either two or three officers in the back yard at the time. The defendant testified that following his last statement to police denying that he lived in the home, the defendant was "tackled" from behind, placed in handcuffs, and told that he was resisting arrest. When the defendant asked why he was under arrest, he was told that he "didn't need to know." His pockets were then emptied by the officers and he was placed on the ground beside a pickup truck. He testified that he subsequently watched as an officer "went through the screen" and "snatched" Tiffany out of the home as Tiffany screamed that officers "had to have a warrant or an arrest warrant." He testified that he observed a total of "six or seven, maybe eight" police officers at the home, as well as "the dog catcher." The defendant testified that he continued to ask officers "when did [he] get arrested or how was [he] resisting arrest," but was never given an answer. He testified that he observed an officer "searching a trash can" in an area of the yard by the back

5

deck; he agreed with counsel that the area where the trash can was located was an area in which he would "barbecue and have intimate family activities." The defendant testified that he was transported to the Cahokia police station, where he was placed in a holding cell for what he believed to be "two days," before he was ultimately taken to the St. Clair County jail and then brought before a judge.

¶ 7    On cross-examination, the defendant conceded that although he stayed at Polzin's home "all the time" between April 10, 2012, and May 22, 2012, he did not have keys to the home, did not pay bills for the home, and did not buy groceries for the home. He testified that he kept clothing in two of the bedroom dresser drawers, took showers at the home, ate most meals at the home, and did his laundry at the home. He stated that he slept in bed with Polzin at the home even when Scott was in town and at the home, and that on those occasions Scott slept in the living room. He was not asked by the State if he invited police to meet him at the back door to the home. At the conclusion of the defendant's testimony, the State moved to bifurcate the hearing, because none of the police officers who participated in the events at the residence were present to testify. Judge Haida agreed to the State's request and the hearing was continued until the following day.

¶ 8    However, on the following day, May 30, 2013, the State filed a written motion to continue the hearing until June 3, 2013. The State represented to the court that none of the three police officers it planned to call were present. The State offered several explanations for why the officers were not present, to which Judge Haida responded: "I'm not satisfied with what's happened here. I'm not really satisfied with your answers

6

either."  Nevertheless, because he was interested in deciding "this case based upon the merits of the case," he ruled that he would give the State "one more chance" to present its witnesses, but warned the State, "If your witnesses aren't here, then we will proceed *** without the witnesses."  Over the objection of defense counsel, he reset the matter for June 3, 2013.

¶ 9    On June 3, 2013, the hearing continued.  The State called Investigator Thomas Peters of the St. Clair County sheriff's department as its sole witness.  Peters testified that on May 22, 2012, while he was working as part of a drug tactical unit, an investigator with whom he regularly worked, Chad Nord, received information about "some drug equipment believed to be used in the production of methamphetamine" located at a home in Cahokia.  The two officers went to the home, which was owned by the defendant's mother and in which the defendant once lived.  The present occupant of the home, Robert Haney, showed the officers an area of a detached building in which they found a bottle containing what Peters believed, based upon his training, to be materials "left over from an active shake-and-bake cook for methamphetamine."  The officers notified the Illinois State Police Meth Response Team, which responded to the home.  Because Haney had told Peters that he believed the bottle belonged to the defendant, a group of officers made their way to Polzin's home, where they spotted a truck that they knew, as the result of "many calls involving this truck," belonged to the defendant.  Peters testified that he and Nord "went to the front door to try to make contact, and members of the [Meth Response Team] were at the back door."  He testified that he observed Polzin in the home, but that "[s]he didn't want to come to the front door, said that we needed a warrant to speak with

7

her."  He testified that "at that time *** the State Police guys made contact with [the defendant] at the back door."  Peters testified that he did not have contact with the defendant until the defendant was brought from the back of the home toward the front. He testified that the defendant denied living in the home, and that when officers "found the materials outside of the house, he told [him], he says, 'none of it is mine.  I stay across the street.  I'm here visiting.' "

¶ 10   On cross-examination, Peters conceded that on the date in question he did not prepare a police report, and that to prepare for the hearing he had reviewed reports created by two other officers.  Peters testified that he had participated in "[p]robably close to 50" consensual contacts known as "knock and talks" during his career.  He conceded that Polzin had told police that she did not want to come out of the house.  He testified that he did not see her taken out of the house and did not know how she ended up outside in handcuffs.  He testified that he saw a Drano can "[s]itting right on top" of a flip-style "waste management trash can" in the private area of the home between the back deck and the garage, and that he believed that blister packs had been found "next to the trash cans." Peters testified that a total of six officers went to the Polzin residence, and that "[t]wo went to the front, and [he thought] all four might have went [*sic*] to back."  He testified that he did not recall the defendant coming to the front door, nor did he recall the defendant stating that the defendant had to go out the back door because of the dogs.  He testified that after the couple was arrested, he had no further contact with Polzin, but that he and Nord interviewed the defendant that evening at the Cahokia police station at approximately 8:30 pm.

¶ 11    At the conclusion of Peters' testimony, Judge Haida entertained argument from the parties.  The State conceded that the defendant was, at the very least, for legal purposes an overnight guest in Polzin's home, but claimed that he should nevertheless not enjoy a reasonable expectation of privacy therein.  Judge Haida remarked that Polzin's testimony about the events surrounding her removal from the home was unrebutted, and that therefore Judge Haida was "taking it as true."  He stated that "it's outrageous conduct to drag somebody from a home" and expressed his opinion that any consent to search later obtained from Polzin was not voluntary.  He stated that he agreed with the defense that "a 'knock and talk' is not walking around the house into the back yard into a private area" and that his finding based upon the testimony presented to him was that officers "couldn't have seen the Drano from the front door," that it "would not have been seen but for the violation of the curtilage," and that he did not agree with the State that the Drano was in plain view because "[i]t's only in plain view once you're in the private area of the home." He further found that the officers did not have probable cause to arrest either Polzin or the defendant, and stated that the fact that the police ignored Polzin's invocation of her right to insist that the police obtain a warrant was "very offensive" to him.  Judge Haida stated, "In my years of law enforcement, I don't know that I've seen anything that exceeds what–the conduct that I've seen here."  He was equally disturbed that he did not "know who those officers were," because "[t]hey weren't presented by the State."  He granted the defendant's motion to suppress evidence.

¶ 12    Subsequently, on June 7, 2013, the defendant filed a motion to suppress statement. On June 27, 2013, a hearing was held on the defendant's motion, again before Judge

9

Haida. The State began the hearing by stating that it was "going to be stipulating to all of the evidence" presented at the earlier proceedings. The State then called Investigator Chad Nord as its sole witness. Nord testified that on May 22, 2012, he was working as part of the drug tactical unit, with which he had been working for "[p]robably three months, two months" at that time. He was asked if on May 22, 2012, prior to the arrest of the defendant, he was "privy to any information with regards to purchases of pseudoephedrine by" the defendant and by Polzin. He stated that he was, but he was not then asked, and he did not then testify as to, what the alleged information was. He testified that he received information from "a special program" run by the Illinois State Police "Methamphetamine Team," but again did not testify as to what information he received. He testified that he was one of two officers who interviewed the defendant after the defendant was arrested. When asked if he remembered when that interview took place, he testified, "I'm not sure in that time frame." He was then asked if he believed the interview "happened within the same hour of arrest," to which he responded, "I believe so, yes." Immediately thereafter, he was asked, still by counsel for the State, if he had any independent recollection as to when the interview took place, to which he responded, "I can't recall." Following his testimony, Judge Haida again entertained argument from the parties. He then issued his ruling, granting the defendant's motion to suppress statement because he found the arrest of the defendant "was without probable cause" and that "the taint of the improper arrest was not purged by subsequent events."

¶ 13                                   ANALYSIS

¶ 14    We begin by addressing a number of distortions of the record on appeal made by

the State in the "Statement of Facts" section of its opening brief. These distortions are problematic not only because the State relies upon the distortions as key elements in support of its legal arguments on appeal, but also because the distortions undermine the credibility of the State in general. First, we note that when discussing the appearance of officers at the back door of Polzin's home, the State posits that Peters and Nord "went to the front door, and some time after that officers from the Illinois State Police Meth Response Team were at the back door." In support of this proposition, the State cites to the testimony of Peters, and later suggests that the officers were invited to the back door by the defendant. However, as detailed above, Peters testified on direct examination that he and Nord "went to the front door to try to make contact, and members of the [Meth Response Team] were at the back door," and on cross-examination that a total of six officers went to the Polzin residence, of whom "[t]wo went to the front, and [he thought] all four might have went [*sic*] to back." No reasonable reading of Peters' testimony supports the State's rather fanciful notion that all of the officers began at the front door and only went to the back door upon the invitation of the defendant. Indeed, the defendant's testimony, which was unrebutted and in fact stipulated to by the State at the second of the hearings in this case, was that he did not invite officers to meet him at the back door, and that when he reached the back door there were already two or three officers present there, one of whom began to repeatedly ask him if he lived in the home.

¶ 15    Second, when discussing whether Scott consented to a search of the home, the State represents to this court that "[a]t some point during the interview, Ms. Polzin was allowed to speak to her boyfriend and she testified that her boyfriend gave officers

11

permission to search the house."  In fact, as detailed above, when asked if after speaking with Scott, Polzin gave officers consent to search her home, Polzin testified: "No.  They said that he gave them permission."  She later reiterated, "They told me that Scott gave them permission to search the home."  No reasonable reading of Polzin's testimony supports the State's notion that Scott actually gave permission for the home to be searched, and certainly there is no basis for the State to claim that Polzin testified that Scott gave officers permission to search the house when she clearly did not so testify.  Indeed, Polzin's testimony−and we note that Polzin's testimony, like the defendant's, was unrebutted and was stipulated to by the State at the second hearing in this case−was that the same officers who told her that she could be held for up to two years "because of some Patriot Act or something," and that the police did not have to let her speak to an attorney or anyone else "until like 72 hours or something," also told her that Scott had given them permission to search the home.[2]

---

[2]The State posits that Polzin's testimony should not be believed because "the video of Ms. Polzin's interrogation does not depict the allegation concerning the Patriot Act or the allegation that officers did not have to let Ms. Polzin call a lawyer."  However, Polzin never claimed that those statements were made to her while she was being videotaped, and, as detailed above and below, the record on appeal presented by the State contains no ruling from Judge Haida with regard to the admission of the remainder of the videotaped interview.  Accordingly, it is not clear from the record on appeal how much of the videotape was admitted and is properly before this court on appeal.  In any event, we do not agree with the State that Polzin's failure to mention the allegations on the videotape

¶ 16    Third, when representing what Nord and other officers knew or did not know prior to the arrest of the defendant, the State claims that Nord "was aware that the defendant had made multiple purchases of pseudoephedrine" and that "Polzin had also made purchases of pseudoephedrine," and that "[a]rresting officers had the information about Polzin and the defendant making multiple buys of pseudoephedrine prior to making their arrests." In support of these propositions, the State cites to the testimony of Nord. In fact, as detailed above, when Nord was asked if on May 22, 2012, prior to the arrest of the defendant, he was "privy to any information with regards to purchases of pseudoephedrine by" the defendant and by Polzin, he stated that he was, but he was not then asked, and he did not then testify as to, what the alleged information was. Moreover, although Nord next testified that he received information from "a special program" run by the Illinois State Police "Methamphetamine Team," he once more was not asked, and did not testify as to, what information he received. Thus, Nord's testimony does not support the State's notion that the defendant and Polzin had made "multiple buys of pseudoephedrine." In fact, there is no sworn testimony from anyone that prior to the arrest of the defendant and Polzin, officers "knew" the defendant and Polzin had made any buys of pseudoephedrine at all, let alone multiple ones. Although the failure to follow up with Nord on this detail may have just been the result of inept questioning or lack of preparation by the State, we must acknowledge that it may also have been deliberate, and may have reflected the fact that the State knew that any further

somehow contradicts or rebuts Polzin's live testimony under oath about events she claims happened before she was videotaped.

13

information elicited from Nord under oath would not have supported the State's case. Given the other distortions made by the State in this case, not to mention the unrebutted testimony about the conduct of the officers who attacked Polzin and the defendant at the residence, we are not inclined to indulge the State's unsupported notion that Nord or anyone else testified that the defendant and Polzin had made "multiple buys of pseudoephedrine."

¶ 17　Fourth, when representing Nord's testimony about when the questioning of the defendant took place, the State asserts that Nord testified "that to his recollection, the questioning of the defendant took place within the hour of his arrest on the present charges." In fact, as detailed above, when asked if he remembered when the interview took place, Nord testified, "I'm not sure in that time frame." He was then asked if he believed the interview "happened within the same hour of arrest," to which he responded, "I believe so, yes." Immediately thereafter, he was asked, still by counsel for the State, if he had any independent recollection as to when the interview took place, to which he responded, "I can't recall." Given Nord's specific testimony that he had no independent recollection of when the interview took place, there is no support in the record for the State's notion that Nord testified "that to his recollection, the questioning of the defendant took place within the hour of his arrest on the present charges." He simply did not so testify.

¶ 18　Fifth, as discussed briefly above, although the State declares in its "Statement of Facts" that "[n]otably, the video of Ms. Polzin's interrogation does not depict the allegation concerning the Patriot Act or the allegation that officers did not have to let Ms.

Polzin call a lawyer," the State provides no citation to the record in support of this declaration. Nor does the State provide citation to the record in its argument section when it invites this court to view the DVD. As detailed above, in the circuit court, counsel for the defendant moved to have the first five minutes of Polzin's videotaped interview admitted into evidence. The State did not object, and the first five minutes of the videotape were admitted into evidence. Subsequently, counsel for the defendant moved to have the last three minutes of the videotaped interview admitted into evidence. The State did not object, and the last three minutes of the videotape were admitted into evidence. The State expressed concern that the entire videotape was not being admitted; however, the judge declined to rule on the admission of the remainder of the videotaped interview, stating, "We can take up the other issue later." However, the record on appeal presented by the State contains no ruling, at anytime thereafter, from Judge Haida with regard to the admission of the remainder of the videotaped interview. Given the other distortions of the record by the State on appeal, it would not be unreasonable for this court to infer that appellate counsel was aware that the record presented by the State to this court does not demonstrate that anything other than the first five minutes and the last three minutes of the interview were admitted by Judge Haida, and that the State's lack of citation to the record with regard to the admission of the videotape is a deliberate attempt to obfuscate that fact.

¶ 19    We remind the State that distortions of the record on appeal do not aid this court in rendering fair and just decisions, and that for a party's legal arguments to be given proper consideration, they must be supported by a careful, accurate, and reasonable presentation

15

of the facts contained in the record on appeal.

¶ 20   We turn now to our standard of review.  "The review of a trial court's ruling on a motion to suppress involves mixed questions of fact and law." *People v. Redman*, 386 Ill. App. 3d 409, 417 (2008).  With regard to questions of fact, the Illinois Supreme Court has noted that "findings of historical fact should be reviewed only for clear error and \*\*\* reviewing courts must give due weight to inferences drawn from those facts by the fact finder." *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).  Accordingly, we will give "great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence." *Redman*, 386 Ill. App. 3d at 417.  However, we review *de novo* the legal determination of whether suppression was appropriate under those facts.  *Id*.

¶ 21   With regard to the defendant's motion to suppress evidence, the State first asserts that the defendant cannot claim that his rights under the fourth amendment have been violated because he cannot demonstrate that he had a reasonable expectation of privacy in the home and in the curtilage surrounding the home.  As the State correctly posits, "to claim the protection of the fourth amendment, a defendant must demonstrate that he or she personally has an expectation of privacy in the place searched and that his or her expectation is reasonable." *People v. Pitman*, 211 Ill. 2d 502, 514 (2004).  As both parties agree, "a person can have a legally sufficient interest in a place other than his own home so that the [f]ourth [a]mendment protects him from unreasonable governmental intrusion into that place." *Rakas v. Illinois*, 439 U.S. 128, 142 (1978).  It is undisputed that the United States Supreme Court has recognized that an overnight guest in a home

16

may claim the protection of the fourth amendment. See, *e.g.*, *Minnesota v. Olson*, 495 U.S. 91, 98 (1990). It is also undisputed that where fourth amendment protection exists, that protection "extends to a home's curtilage, *i.e.*, the land immediately surrounding and associated with the home." *People v. Pitman*, 211 Ill. 2d 502, 516 (2004).

¶ 22 In the case at bar, as detailed above, the State conceded at the trial court level that the defendant was, at the very least, for legal purposes an overnight guest in Polzin's home. Although Judge Haida did not make explicit all of his findings of fact, implicit in his finding that the defendant's fourth amendment rights were violated in this case is the factual finding that the defendant was at the very least an overnight guest in Polzin's home who had a reasonable expectation of privacy in the area from which the materials were seized. As noted above, we will give great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. See, *e.g.*, *People v. Redman*, 386 Ill. App. 3d 409, 417 (2008). We find Judge Haida's factual findings to be supported by the evidence presented in this case, which is described in great detail above, and we will not disturb them.

¶ 23 On appeal, the State contends the defendant had no reasonable expectation of privacy in the area where the materials were seized because they were discovered "in plain view" during a "knock and talk" that the State claims was "a consensual encounter" that "was completely lawful." The State first posits that the defendant "invited" the officers to the back door. As explained thoroughly above, no reasonable reading of the testimony of Peters and the defendant supports the proposition that all of the officers began at the front door and only went to the back door upon the invitation of the

17

defendant. Moreover, although, as discussed above, Judge Haida did not make all of his findings of fact explicit, implicit within his factual finding that the officers "couldn't have seen the Drano from the front door," and that it "would not have been seen but for the violation of the curtilage," is his factual finding that no consent was given for the police to enter the curtilage, for the use of the term "violation" would not be appropriate to describe the appearance of the officers in an area in which they had consent to be. Because this finding is not against the manifest weight of the evidence presented to Judge Haida, no clear error exists and we will not disturb Judge Haida's finding.

¶ 24 The State next contends that even if officers were not invited into the back yard of Polzin's home, they could still legally enter it to initiate their "knock and talk." In support of this proposition, the State cites *People v. Redman*, 386 Ill. App. 3d 409, 418 (2008), wherein our colleagues in the Fourth District held that officers conducting a "knock and talk" are permitted to "go beyond the front door to investigate by approaching the back door of a residence–either when no one answers a knock on the front door or where a legitimate reason is shown for approaching the back door." We note initially that although the *Redman* court uses terminology often invoked in "knock and talk" cases, the facts before the *Redman* court were far different from those found in most cases involving a "knock and talk," which, as the State itself posits on appeal, is "a consensual encounter." In *Redman*, Officer Richard Shutter of the Clark County sheriff's department testified that he was on routine patrol in his squad car, with his windows up and his heater on, when he detected a strong chemical odor that he knew was related to methamphetamine manufacturing. *Id*. at 411-12. Shutter testified that when he exited his

18

car, he determined the odor was coming from the residence in question, and that by the time he and a second officer "decided to knock on the front door to further investigate," he had already decided to, *inter alia*, "arrest the people in the house." *Id.* at 412. The second officer involved, Officer Bill Brown of the Clark County sheriff's department, likewise testified that as the officers approached the residence in question, he intended to further investigate "and also arrest the occupants of the house." *Id.* Thus, *Redman* was decided in a context in which officers approached a residence with the belief that a crime was being committed therein and with the intention of arresting the occupants thereof. Under those circumstances, we agree with the *Redman* court that the decision to deploy one officer to the front door and the second officer to the rear door "in case the occupants attempted to leave from the rear and Officer Shutter needed protection" (*id.* at 419) was a reasonable one.

¶ 25    We cannot agree with the State, however, that *Redman* should be read to stand for the broad proposition that it is always permissible, under the aegis of a consensual "knock and talk," for multiple officers to position themselves at multiple entrances to a home before even waiting to see if the knock at the principal entrance to the home will be answered. In *Florida v. Jardines*, ___ U.S. ___, ___, 133 S. Ct. 1409, 1415-16 (2013), the United States Supreme Court recently reiterated long-standing principles related to when and to what extent it is permissible for police officers without a warrant to approach a private residence. Noting that " 'the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds' " (*id.* at ___, 133 S. Ct. at 1415 (quoting

*Alexandria*, 341 U.S. 622, 626 (1951))), the Court added that the "implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id*. Accordingly, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " *Id*. at ___, 133 S. Ct. at 1416 (quoting *Kentucky v. King*, 563 U.S. ___, ___, 131 S. Ct. 1849, 1862 (2011)).

¶ 26    Problems arise, however, when officers go beyond what any private citizen might do, because "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id*.    Indeed, as lower federal courts have recognized, a "knock and talk" is constitutionally permissible only because it is a *consensual* encounter between a police officer and a citizen.  Because of the consensual nature of the encounter, "the police themselves must recognize the inherent limits in this more informal way of proceeding." *United States v. Johnson*, 170 F.3d 708, 720 (7th Cir. 1999).  "The purpose of a 'knock and talk' is not to create a show of force, nor to make demands on occupants, nor to raid a residence"; "[i]nstead, the purpose of a 'knock and talk' approach is to make investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search." *United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007).  When consent is not obtained as the result of a "knock and talk," the proper course of actions is for officers to end the encounter "and change[ ] their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance." *Id*. at 356.

¶ 27    Against this backdrop, we decline to read *Redman* as broadly as the State desires;

in the alternative, to the extent *Redman* actually stands for the broad proposition the State imputes to it, we repudiate that proposition and decline to follow *Redman*, finding that in any event, *Redman* does not support the actions of the police officers in this case. Whereas in *Redman*, as discussed above, the officers involved believed that a crime was being committed within the residence in question and had already, by the time they approached the residence, determined that they would arrest its occupants,[3] in the case at bar the State has repeatedly contended, both at the trial level and on appeal, that the purpose of the appearance of the officers at the Polzin residence was to initiate a "consensual encounter" with the home's occupants. We find no legitimate rationale–in a situation such as this, or for that matter in any "knock and talk"–for deploying multiple police officers to cover the multiple entrances to a home in an effort to prevent citizens from "escaping" from a "consensual encounter" with the police. In fact, the defendant and anyone else present in the home had every right to use the back door–or any other door–to avoid a "consensual" encounter they did not wish to have. Nor was any evidence presented in the case at bar from which we could conclude that concern for officer safety necessitated the police intrusion beyond the front door of the home, and we decline to hold that without such evidence "officer safety" can be invoked as a blanket excuse to

---

[3]We note as well that in *Redman*, when no one responded to the repeated knocking of the officers, and to phone calls to the residence from a police dispatcher, the officers at the scene pursued a much different course of action than did the officers in the case at bar: they retreated, set up a perimeter, and called the State's Attorney to request that the process of obtaining a search warrant be started. 386 Ill. App. 3d at 413.

21

turn a consensual "knock and talk" into a show of force or raid that includes multiple officers positioning themselves at multiple entrances to a home. See *United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007) ("The purpose of a 'knock and talk' is not to create a show of force, nor to make demands on occupants, nor to raid a residence"; "[i]nstead, the purpose of a 'knock and talk' approach is to make investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search."). Indeed, the picture painted by the unrebutted evidence in the case at bar is a very disturbing one: multiple officers descending upon, then surrounding, a residence for what is allegedly to be a "consensual" encounter with one or more citizens, and then, when their request for consent is rebuffed, physically attacking both occupants of the residence and arresting them without reason.

¶ 28    The State also posits that in Illinois a citizen can have no reasonable expectation of privacy in what the State characterizes as "abandoned garbage," regardless of whether that abandoned garbage is located within the curtilage of a home or has been placed curbside. As the State itself acknowledges, however, the materials seized in this case were found on top of and beside a trash can, not within one; moreover, the State's argument is premised on the proposition that under *Redman*, officers were lawfully in the back yard at the time they viewed the materials, a premise we have rejected. Finally, we agree with the defendant that the other major infirmity of the State's "abandoned garbage" argument is that all of the cases cited by the State involve materials clearly "abandoned" to a third-party collector or to a communal trash dumpster, and that the State has cited no authority for the proposition that materials found in the private area of a home are

22

somehow not subject to the protections of the fourth amendment based upon the subjective whims of individuals who have no business being in that private area in the first place but who nevertheless deem the materials to be "abandoned" and/or "garbage." Although the State posits that the materials seized by the State should be deemed "abandoned" because the "defendant abandoned the trash when he placed it in the open," there is no factual support for this proposition, as no testimony was adduced from anyone as to who placed the materials in the positions in which they were found and/or when the materials were so placed. The only testimony adduced was the testimony from the defendant and from the State's witness Peters that the materials were found in a private area of the back yard.

¶ 29    In sum, our *de novo* review of whether suppression was appropriate under the facts presented in this case leads us to the same conclusion that Judge Haida reached, and we affirm his order granting the defendant's motion to suppress evidence.

¶ 30    We turn next to Judge Haida's order suppressing the defendant's statement. As noted above, Judge Haida granted the defendant's motion to suppress statement because he found the arrest of the defendant "was without probable cause" and that "the taint of the improper arrest was not purged by subsequent events." The State does not contend that the taint of any improper arrest was somehow purged by subsequent events. Instead, the State contends on appeal that although the defendant's arrest was a warrantless one, it was nevertheless proper because it was supported by probable cause. In advancing this argument, however, the State relies upon several factual assertions that we have already determined are simply not supported by the record on appeal, including the notion that

testimony in the record on appeal demonstrates that officers had "information about Polzin and the defendant making multiple buys of pseudoephedrine prior to making their arrests," and the notion that officers were invited into the back yard and developed probable cause to arrest the defendant on the basis of items in plain view therein. We have discussed above the problems with these arguments. The only potentially legitimate assertion made by the State is that the tip from Haney, and Peters' knowledge that the materials Haney showed him were related to methamphetamine manufacturing, constituted probable cause to arrest the defendant. However, we agree with the defendant that this information alone was not sufficient to give the police probable cause to arrest the defendant; although it is certainly true, as the State contends in its reply brief, that Peters saw for himself the materials presented by Haney and believed, on the basis of his previous training, that they were materials "left over from an active shake-and-bake cook for methamphetamine," there is nothing in the record on appeal presented by the State that ties the materials to the defendant other than Haney's tip and the fact that at some previous point in time the defendant lived in the home. Moreover, there is no evidence that any effort was made to verify Haney's tip other than the botched "knock and talk" at the Polzin home. See, *e.g.*, *People v. Williams*, 147 Ill. 2d 173, 209-10 (1991) (where facts supplied in informant's tip "are essential to a finding of probable cause, the tip must meet standards of reliability before it can be considered in determining probable cause"). Judge Haida did not err in granting the defendant's motion to suppress statement.

¶ 31                                                    CONCLUSION

¶ 32    For the foregoing reasons, we affirm the orders of the circuit court of St. Clair

24

County.

¶ 33   Affirmed.

2014 IL App (5th) 130335

NO. 5-13-0335

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS,      )     Appeal from the
            )     Circuit Court of
      Plaintiff-Appellant,       )     St. Clair County.
            )
v.            )     No. 12-CF-770
            )
DAVID KOFRON,         )     Honorable
            )     Robert B. Haida,
      Defendant-Appellee.      )     Judge, presiding.
_____

**Opinion Filed:**       August 20, 2014
_____

**Justices:**       Honorable Stephen L. Spomer, J.

               Honorable Thomas M. Welch, P.J., and
               Honorable S. Gene Schwarm, J.,
               Concur
_____

**Attorneys**     Hon. Brendan F. Kelly, State's Attorney, St. Clair County, 10 Public
**for**          Square, Belleville, IL 62220
**Appellant**

               Patrick Delfino, Director, Stephen E. Norris, Deputy Director, Kelly
               M. Stacey, Staff Attorney, Office of the State's Attorneys Appellate
               Prosecutor, Fifth District Office, 730 E. Illinois Highway 15, Suite 2,
               P.O. Box 2249, Mt. Vernon, IL 62864
_____

**Attorneys**     Michael J. Pelletier, State Appellate Defender, Ellen J. Curry,
**for**          Deputy Defender, Amanda R. Horner, Assistant Appellate Defender,
**Appellee**    Office of the State Appellate Defender, Fifth Judicial District, 909
               Water Tower Circle, Mt. Vernon, IL 62864
_____