2019 IL App (2d) 170256-U
No. 2-17-0256
Order filed January 3, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-1386 |
| BALTAZAR GERARDO CONTRERAS GONZALEZ, | ) ) ) | Honorable Linda Abrahamson |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court properly denied defendant's motion to suppress evidence, as the officers' actions did not violate fourth amendment protections against unreasonable searches and seizures.

¶ 2   Following a jury trial, defendant, Baltazar G. Contreras Gonzales, was convicted of unlawful possession with intent to deliver methamphetamine, cocaine, and cannabis (720 ILCS 646/55(a)(2)(E) (West 2014); 720 ILCS 570/401(a)(2)(C) (West 2014); 720 ILCS 550/5(g) (West 2014)), as well as possession of a firearm without a firearm owner's identification (FOID) card (430 ILCS 65/2(a)(1) (West 2014)). On appeal, he contends that the trial court erred by denying

his motion to suppress incriminating evidence seized during the execution of a search warrant upon his home. Because the warrant was based on information legally obtained by police, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4     The following facts were assembled from the evidence and testimony presented at the hearing on defendant's motion to suppress and the subsequent jury trial. See *People v. Slater*, 228 Ill. 2d 137, 149 (2008) (in reviewing a trial court's ruling on a motion to suppress, "it is proper to consider the testimony adduced at trial, as well as the suppression hearing.") We recite only the facts relevant to making our decision.

¶ 5     In late July 2014, the Department of Homeland Security (DHS) received a tip from a confidential informant (CI) that a man illegally present in the country had "a large amount of narcotics" at a house located at 504 Lancaster Road in Aurora. The property contains a one-story, single-family home with a detached two-car garage in the northwest corner of the lot. A driveway spans the northern portion of the lot and connects to a small patio adjacent to the home's side door. A large privacy fence abuts the front of the home and surrounds the side and back yards, crossing over the driveway with a gate.

¶ 6     Aurora police officer Paul Lindley, assigned to DHS's Chicago narcotics group, began surveilling the property and, over multiple days, observed defendant exit the home and leave the property in a black Toyota Camry. On August 4, 2014, Lindley and his partner, Special Agent Travis Goff, observed defendant exit the home and get into the Camry. Lindley and Goff followed in an unmarked vehicle while defendant made stops at a nearby fast food restaurant and gas station before returning home. Lindley observed the vehicle make at least one traffic violation—failing to signal when turning left at the corner of Plum and Harrison Streets—two blocks from the property.

¶ 7    Lindley activated the vehicles red and blue lights and initiated a traffic stop after defendant pulled into the driveway, with nearly the entirety of the vehicle within the privacy fence's gate. Defendant remained in the vehicle as Lindley walked up the driveway between the house and car. Assisted by Officer Fernando Zambrano who translated between English and Spanish, Lindley asked defendant for his name and identification. Defendant complied and produced a Mexican voter's identification card. Goff ran defendant's name through a federal database and discovered that defendant was in the country illegally, after having been previously deported.

¶ 8    While Goff was accessing the legality of defendant's presence in the country, Lindley remained near the driver's side front door of the vehicle, completely within the privacy fence. Lindley looked down at his feet and noticed the remnants of some plastic baggies that he believed to be indicative of drug use. Lindley then asked defendant if anyone else lived at the property, and defendant answered no. However, to ensure his and the other officers' safety, Lindley knocked on the side door near the driveway. Receiving no answer, Lindley "buttonhooked" around the privacy fence and walked toward the front door to ensure no one else was present. Walking through some landscaping, about "nine to twelve" inches away from the house, Lindley passed by a window.

¶ 9    Lindley testified that the window had no screen and the blinds, which were two-thirds of the way open, were sticking out. Lindley testified that he could clearly see inside the home and noticed the kitchen table directly below the window had multiple baggies, scissors, and an off-white powdery substance that he believed to be cocaine. Lindley also observed, through the window, in the southwest corner of the living room a small table with a Santa Muerte statue. Lindley took a "double take" of what he observed through the open window and proceeded toward the front door. No one answered when he knocked.

¶ 10   Lindley asked defendant for permission to search the home. Defendant refused. Lindley then obtained a search warrant for the property. After executing the search warrant, police recovered 803.6 grams of methamphetamine and 603.6 grams of cocaine from a bedroom closet, a handgun from between the mattress and box spring in defendant's bedroom, and 9145 grams of cannabis and a firearm from the garage.[1]

¶ 11   Defendant was taken to the Aurora police station and questioned by Zambrano. Zambrano testified that after signing a *Miranda* waiver in Spanish, defendant explained that he lived alone in the home and rented it from some people who he had met at a party. Defendant stated that he was aware of the presence of methamphetamine and cocaine in the home but was unaware of the cannabis in the garage. Defendant also admitted that his fingerprints would be on the packaging of the drugs found in the home. Finally, Zambrano testified that defendant stated that he moved the gun from a closet to his bedroom the night before because there was a party and he wanted to be sure that no one got hurt.

¶ 12   Defendant was indicted on seven counts: (1) unlawful possession of methamphetamine with intent to deliver (720 ILCS 646/55(a)(2)(E) (West 2014)); (2) unlawful possession of methamphetamine (720 ILCS 646/60(b)(5) (West 2014)); (3) unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(C) (West 2014)); (4) unlawful possession of a controlled substance (720 ILCS 570/402(a)(2)(C) (West 2014)); (5) unlawful possession of cannabis with intent to deliver (720 ILCS 550/5(g) (West 2014)); (6) unlawful possession of

---

[1] Defendant stipulated at trial to the amount and character of the substances found in the home as well as the fact that the handgun found in the home was working firearm.

cannabis (720 ILCS 550/4(g) (West 2014)); (7) unlawful possession of a firearm without a FOID card (430 ILCS 65/2(a)(1) (West 2014)).

¶ 13    Defendant filed a motion to suppress evidence, alleging that the officers did not have any probable cause to stop him and that the officers conducted an initial search of his home without his permission or a warrant. A hearing was held on defendant's motion on May 6, 2016. Defendant and Lindley testified.

¶ 14    Lindley testified that on August 4, 2014, he witnessed defendant make several traffic violations. However, the covert car he was driving did not have video capability, and there was no video evidence of defendant's traffic violations. Further, Lindley testified that after witnessing the violation at Plum and Harrison Streets, he did not pull defendant over "immediately," but he did activate the red and blue emergency lights before turning into the driveway. "I just decided, hey, we are going to make the traffic stop, and we are going to do *** what we need to do, but he pulled into the driveway, and I followed him into the driveway." He also admitted that his police report noted that he activated the lights after pulling into the driveway behind defendant. His report also only referenced the single traffic violation at Plum and Harrison Streets, which contradicted both his testimony at the hearing and his affidavit for warrant, in which he averred that he witnessed defendant commit multiple traffic infractions. Lindley also admitted that part of the reason he pulled defendant over was because he was interested in what was inside the house.

"Q. You pulled him over because you wanted to get information about what was inside that house?

A. There were multiple reasons why I decided to pull him over. Yes, it was the traffic violation, identify him, and then I was going to speak to him.

Q. You were interested in what was inside that house; correct?

A. I was, yes. That's one of the many, many things I am interested in."

¶ 15    In addition to the inconsistencies regarding the traffic infractions, Lindley also testified that in his affidavit he noted that there were "several" corners of plastic baggies on the driveway where he was standing talking to defendant. However, in his police report he noted only two baggies. Finally, Lindley testified that the photographic evidence introduced by the State of the home revealed that the blinds were drawn shut and inside the home, rather than open and outside of the home as he testified they were when he walked past the window to knock on the front door.

¶ 16    Defendant's counsel argued that Lindley's inconsistent statements from his report, affidavit for search warrant, and testimony at the hearing was evidence of a changing story and thus made him incredible.

¶ 17    On May 9, 2016, the trial court denied defendant's motion. In denying defendant's motion, the court noted that if the police delayed stopping the defendant until he was in the driveway behind the privacy fence, as defendant's counsel argued, it "certainly would be concerning." However, the court found Lindley's account of the event to be "very credible." In discussing Lindley's observation's at defendant's window, the court stated "I believe that the blinds were up, and he was able to see that which he described and put in his affidavit. But even if I take that part out, I think there is sufficient evidence to support the issuance of the warrant ***.":

¶ 18    The matter proceeded to a two-day jury trial. The jury heard evidence of the traffic stop, what Lindley saw through the window of the home, the subsequent search of the home pursuant to the warrant, and the evidence recovered from the search. The jury found defendant guilty on all seven counts.

¶ 19    On October 12, 2016, defendant filed a motion to reconsider the verdict or, in the alternative, for a new trial and filed a similarly titled amended motion on November 21. The trial

court heard argument on the motion on November 29 and subsequently denied it. The court then sentenced defendant to serve 15 years concurrently for each drug charge, after merging the lesser included drug charges into their larger counterparts, and entered a conviction on the firearm charge.

¶ 20    On December 12, 2016, defendant filed a motion to reconsider sentence. Trial court heard argument on it on April 5, 2017, and denied defendant's motion. Defendant timely appealed.

¶ 21                                   II. ANALYSIS

¶ 22    On appeal, defendant contends that the trial court erred in denying his motion to suppress evidence. In support of his contention, defendant argues that Lindley delayed initiating the traffic stop to gain access to the home's curtilage to conduct a search without a warrant in violation of the fourth amendment. Defendant argues that because that initial search was illegal, all evidence gathered from the execution of the warrant should be suppressed and his convictions reversed. The State responds that suppression of the evidence gathered at the property is unwarranted because defendant failed to establish that the officers' conduct was unreasonable or constituted a warrantless search in violation of the fourth amendment.

¶ 23    To prevail on a motion to suppress evidence at the trial level, the defendant bears the ultimate burden of establishing that there was a search or seizure and that such search or seizure was illegal (unreasonable). *People v. Brooks*, 2017 IL 121413, ¶ 22. In reviewing a trial court's ruling on a motion to suppress evidence, appellate courts apply a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d. 530, 542 (2006). We give great deference to a trial court's findings of fact and credibility determinations when ruling on a motion to suppress. *Slater*, 228 Ill. 2d at 149. We will reverse the trial court's factual and credibility findings only if they are against the manifest weight of the evidence. *People v. Murdock*, 2012 IL 112362, ¶ 40. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if

the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). However, we may undertake our own assessment of the facts in relation to the issues and draw our own conclusions when deciding what relief should have been granted. *Luedemann*, 222 Ill. 2d at 542. Thus, the trial court's ultimate ruling as to whether the suppression is warranted is reviewed *de novo*. *Id.* at 542-43.

¶ 24     We begin our analysis by examining the initiation of the traffic stop. Both the fourth amendment of the United States Constitution and the search and seizure provision of the Illinois Constitution protect individuals from unreasonable searches and seizures of their persons, houses, papers and other possessions. See U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 15. The temporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the fourth amendment. *Whren v. U.S.*, 517 U.S. 806, 809-810 (1996).  A traffic stop is thus subject to the constitutional imperative that it be reasonable under the circumstances; the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Delaware v. Prouse*, 440 U.S. 648, 659 (1979). The reasonableness of a traffic stop does not depend on the actual motivations of the police officers involved. *Whren*, 517 U.S. at 812-13. However, an otherwise reasonable stop can become unlawful if subsequent police conduct either unreasonably prolongs the duration of the stop or independently triggers the fourth amendment. *People v. Baldwin*, 388 Ill. App. 3d 1028, 1033 (2009).

¶ 25     On appeal, defendant does not argue that the police had probable cause to pull defendant over for failure to use a turn signal but takes issue with the timing of the traffic stop. Defendant points to Lindley's testimony at the hearing to demonstrate that the officers waited until defendant

was in his driveway before activating their lights and initiating the traffic stop. This, defendant argues, allowed the officers unlawful access into the home's curtilage, triggering the fourth amendment protections. The State responds that the trial court considered that argument, but rejected it, instead finding that Lindley was a credible witness.

¶ 26    During cross-examination, Lindley agreed with defense counsel that the way his police report was written, "it appears that [he] pulled into the driveway behind [defendant] and then activated [the red and blue lights]." Defendant maintains that "[t]here is no reasonable interpretation of the facts other than Lindley timed the stop to investigate" the home. However, Lindley further testified that he "actually activated" the vehicle's lights before defendant pulled into the driveway, and Lindley simply "followed [defendant] into the driveway." Although it recognized defendant's argument regarding the timing of the stop as "concerning," the court dismissed it by stating there was nothing that prohibits the officers from stopping defendant in his driveway. See *People v. Wear*, 229 Ill. 2d 545, 564-565 (2008) (holding that police had probable cause to arrest a driver on a suspected DUI in his home after observing his vehicle make several traffic violations and following driver for several blocks into his driveway). The court further found that Lindley was "a very credible witness."

¶ 27    Upon reviewing the record, we find no basis upon which to reverse the trial court's credibility findings. Although defendant was able to impeach Lindley on his prior inconsistent statements found within his police report, that alone does not render Lindley's recitation of what occurred on August 4 an unreasonable interpretation of the facts, as he argues. The trial court was in the best position to determine the credibility of the witnesses and resolve any conflicts in their testimony. See *People v. Evans*, 296 Ill. App. 3d 1, 9 (1997). Here, the trial court found Lindley to be "very credible" and that his testimony was not that of a "changing story." We cannot say that

the trial court's decision was arbitrary or not based on the evidence presented to it and thus not against the manifest weight of the evidence.

¶ 28   We now examine the officers' actions after the stop was initiated to determine if defendant's fourth amendment rights were subsequently violated. Defendant argues that Lindley's actions after initiating the traffic stop amounted to an unreasonable physical intrusion of his home's curtilage. Thus, defendant asserts, Lindley conducted an initial warrantless search into the home's curtilage. We disagree.

¶ 29   A search triggering fourth amendment protections can be identified by the police either physically intruding onto constitutionally protected areas in a manner that exceeds the societal norms for acceptable social behavior, per *Florida v. Jardines*, 569 U.S. 1 (2013), or violating the expectation of privacy test set forth in *Katz v. United States*, 389 U.S. 347 (1967). Akin to the seizure of an individual, "reasonableness" under the fourth amendment for a search generally requires a warrant supported by probable cause, absent exigent circumstances. *People v. Johnson*, 237 Ill. 2d 81, 89-91 (2010).

¶ 30   An individual's home and its curtilage, the area immediately surrounding and associated with the home, are the "first among equals" when it comes to the fourth amendment's protections. *Jardines*, 569 U.S. at 6-7. This is due, in part, because "privacy expectations are most heightened" there. *Collins v. Virginia*, 584 U.S. —, 138 S. Ct. 1663, 1670 (2018). "In determining whether a particular area falls within a home's curtilage, a court asks whether the area harbors the intimate activities commonly associated with the sanctity of a person's home and the privacies of life." *People v. Pitman*, 211 Ill. 2d 502, 516 (2004). Curtilage is determined by four factors: (1) the proximity of the area claimed to be the home's curtilage, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the

steps taken by the resident to protect the area from observation by people passing by. *United States v. Dunn*, 480 U.S. 294, 301 (1987).

¶ 31     Here, the area where Lindley initially approached defendant was within the home's curtilage. The driveway abutted the home's small patio connected to the home's side door and led to a detached garage, all located behind a large privacy fence. Thus, the operative question is whether Lindley's actions exceed the societal norms for acceptable social behavior. Given the facts before us, we conclude that they did not.

¶ 32     Lindley approached the driver's side of the vehicle through the open security fence gate to "identify" and "speak" with defendant regarding the traffic violation. Defendant did not exit his vehicle. Based on the identification that defendant produced, the officers were able to corroborate a portion of the CI's tip, that an individual residing at 504 Lancaster was in the country illegally, furthering that investigation as well. Lindley's actions—asking for the driver's identification— and location—near the driver's door—simply followed the general format of a traffic stop.

¶ 33     While speaking to defendant, Lindley "looked down at the ground" and saw remnants of plastic baggies. Based on his training and experience, he recognized the remnants as "indicative of personal use" or "somebody using in the driveway and then dropping the bagg[ie]." This further corroborated the CI's tip of drugs being present in the home. The plain view doctrine supplements a prior valid reason for being present and permits the warrantless seizure of evidence in plain view because it does not constitute a general, intrusive invasion of a person's privacy. *People v. Hassan*, 253 Ill. App. 3d 558, 569 (1993). Three requirements must be met to apply the plain view doctrine: (1) officers must be lawfully in a position from which they view the object, (2) the incriminating character of the object must be immediately apparent, and (3) officers must have a lawful right of access to the object. *People v. Jones*, 215 Ill. 2d 261, 271-72 (2005).

¶ 34    Here, all three requirements are met. Lindley was lawfully conducting a traffic stop from defendant's failure to use a turn signal and furthering an investigation of a CI's tip. He recognized the baggie remnants from his experience with narcotics purchases in the past and collected them as evidence of a crime. This is not atypical. See *People v. Brandt*, 2019 IL App (4th) 180219, ¶ 40 (upholding trial court's determination to allow an officer's observations of cannabis in the curtilage of home while conducting a "knock and talk" with defendant (quoting *United States v, Hatfield*, 333 F.3d 1189, 1194 (10th Cir. 2003) "[W]hen the police come on to private property to conduct an investigation * * * and restrict their movements to places visitors could be expected to go ([e.g.], walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.")); *contra People v. Kofron*, 2014 IL App (5th) 130335, ¶ 23 (upholding the trial court's determination to suppress an officer's observation of evidence of methamphetamine manufacturing in curtilage of home because evidence "would not have been seen but for the violation of the curtilage").

¶ 35    Lindley continued his investigation by knocking on the side door and, having received no answer there, the front door to ensure his and the other officers' safety. Thus, Lindley had a legitimate reason to walk toward the front door when he observed the open window. *People v. Redman*, 386 Ill. App. 3d 409, 419 (2008). Once an officer is legitimately present on the property, he may properly observe any evidence lying about in the open. *Id.* We must give great deference to the trial court's findings of fact and credibility determinations. *People v. Cregan*, 2014 IL 113600, ¶ 59. Here, the trial court clearly established that it "believe[d] that the blinds were up, and [Lindley] was able to see" the off-white powdery substance, baggies, and scissors on the kitchen table as well as the Santa Muerte statue in the corner of the living room as he approached

the front door. We cannot say that the opposite conclusion was clearly evident, and thus the court's findings were not against the manifest weight of the evidence.

¶ 36    Finally, defendant urges this court, both in his brief and at oral argument, to use the guidance recently provided by the Supreme Court in *Collins v. Virginia* to the case at hand. In *Collins* the Court determined that the automobile exception to the warrant requirement for a search does not allow an officer to enter a home or its curtilage to search a parked automobile. *Collins*, 138 S. Ct. at 1671. Defendant argues that *Collins* is instructive to us because the Court reaffirmed the primacy of fourth amendment protections afforded to homes and their curtilage. Although defendant's recitation of the holding in *Collins* is accurate, the analysis is inapplicable here. In *Collins*, an officer walked up a driveway—while the defendant was not present—to a partially enclosed area, lifted a tarp covering a motorcycle, ran a search of the license plate and vehicle identification number, and confirmed that the motorcycle was stolen. *Id.* at 1668. The Court held those actions to be a physical intrusion which invaded the defendant's fourth amendment interests in both the motorcycle and the home's curtilage. *Id.* at 1671.

¶ 37    Such is not the case here. As noted in the analysis above, Lindley did not unreasonably invade the home's curtilage to conduct a search, he followed defendant into the driveway to conduct a traffic stop. What flowed therefrom, the confirmation of the CI's tip that defendant was not present in the country legally, the recognition of the plastic baggie remnants, and the observation of incriminating evidence through an open window, cannot be likened to the officers' physical intrusion to conduct a search in *Collins*.

¶ 38    For the foregoing reasons, we conclude that the trial court's determination that the actions the police took on August 4, 2014, were reasonable is not against the manifest weight of the evidence. Upon our own view of the facts of the case, we hold that the officers' actions were not

an unreasonable intrusion on the home's curtilage and thus affirm the trial court's denying of defendant's motion to suppress.

¶ 39                              III. CONCLUSION

¶ 40    For the reasons stated, we affirm the trial court's denial of defendant's motion to suppress and affirm defendant's convictions for unlawful possession with intent to deliver methamphetamine, cocaine, and cannabis as well as possession of a firearm without a FOID card.

¶ 41    Affirmed.